TOSHIBA V. SPM FLOW CONTROL

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-03-156-CV

TOSHIBA MACHINE CO., AMERICA APPELLANT

V.

SPM FLOW CONTROL, INC. APPELLEE

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION ON REHEARING

------------

After reviewing Appellant, Toshiba Machine Co., America’s motion for rehearing, we deny the motion.  We withdraw our June 2, 2005 opinion and judgment and substitute the following.  Our ultimate conclusions remain unchanged.

Introduction

This case arises from the sale of two large machine tools.  Toshiba Machine Company of America (“Toshiba”) appeals a $9.25 million judgment  on a jury verdict in favor of S.P.M. Flow Control, Inc. (“SPM”).  In twelve issues, Toshiba complains of legally insufficient evidence to support jury findings on various aspects of SPM’s breach of contract claims, mutually exclusive and inconsistent theories of recovery, overlapping damage awards, and excessive attorney’s fees.  In a single issue, SPM complains that the trial court used the wrong date to compute prejudgment interest.  We affirm the judgment in all respects.

Factual and Procedural Background

SPM manufactures heavy-duty oilfield pumps.  The pumps consist of two components:  a “power end” and a “fluid end.”  SPM makes the fluid ends from blocks of solid steel weighing 3,000-4,000 pounds.  The fluid ends have a complex internal shape machined through a process called “internal contouring.” 

In 1996, SPM began to shop for new machine tools to make fluid ends.  The machines SPM used at the time dated from the 1960s and required 115 hours to make a single fluid end.  SPM’s primary goal in replacing the old machines was to reduce the time required to make a fluid end.  SPM enlisted the help of Maruka, U.S.A., Inc., a machine tool distributor, to find suitable replacements.  Maruka presented SPM with literature and quotes for several machine tools, including Toshiba’s BMC 1000 Horizontal Machining Center (“BMC-1000"). 

SPM initially rejected Toshiba’s quote because the BMC-1000 lacked the ability to perform internal contouring.  Soon thereafter, however, Toshiba informed SPM that it had developed new software for the BMC-1000 that made internal contouring possible.  Toshiba called the software, and the process it controlled, “orbit boring.”  Toshiba told SPM that Toshiba customers in Japan were already using the orbit-boring software on BMC-1000 machines. 

Toshiba represented that orbit boring on the BMC-1000 could make fluid ends in much less time than SPM’s existing tools.  According to Toshiba, orbit boring allowed one cutting tool to do the work of many.  The time saved by not having to change cutting tools would, said Toshiba, reduce the time needed to a make a fluid end, even though the cutting speed of the BMC-1000 was slower than that of SPM’s existing equipment.  SPM employees testified that Toshiba employees said, at various times before and after the sale, that orbit boring would allow SPM to make a fluid end in anywhere from fifteen to fifty hours.

A key issue at trial was what the term “orbit boring” meant.  According to SPM’s president, Dan Lowrance, Toshiba promoted orbit boring, also called “shake turning,” as a new process that would bring new functionality to the BMC-1000.  According to Toshiba’s regional sales manager, Steve Oliphant, orbit boring on the BMC-1000 was simply a combination of older techniques called “Hale Interpolation” and “Archimedes Interpolation.”  Complicating the issue, Toshiba’s parent company in Japan developed a new “concept” machine tool, the NX-76, to showcase what it touted as a “revolutionary” new process—a process also called “orbit boring.”  The parties hotly disputed whether shake turning on the BMC-1000 was the same process as orbit boring on the NX-76.  SPM argued that Toshiba sold SPM orbit boring but delivered Hale and Archimedes Interpolation.  Toshiba argued that orbit boring and shake turning were two names for the same process, regardless of which machine was involved.

In December 1997, SPM issued a purchase order for a BMC-1000 that Toshiba had available for immediate delivery.  SPM’s purchase order incorporated a proposal from Maruka in which Maruka listed “orbit machining” as a $20,000 option, and stipulated that Toshiba would provide a five-year warranty on “[o]rbit machining software, including support, updates and revisions as they become available.”  SPM also attached to the purchase order a list of terms captioned “Addendum ‘A’.”  Those terms included the following:

• Toshiba would machine a fluid end on a BMC-1000 from a raw forging that SPM had already shipped to Japan, and provide to SPM the data gathered during the machining process;

• Toshiba would provide a process cycle time, i.e., the time it should take to machine a fluid end on the BMC-1000;

• Toshiba would provide the technical support and training needed to make a fluid end on the BMC-1000; and

• SPM’s acceptance of the BMC-1000 was conditioned on the successful production of a fluid end on the machine at SPM’s factory.

Toshiba accepted SPM’s purchase order and down payment without commenting on Addendum A.  Toshiba delivered the BMC-1000 to SPM’s factory in March 1998.  Significantly, Toshiba delivered the machine without the software needed to perform orbit boring. 

In late April 1998, Toshiba sent a programmer, Takeshi Ohki, to install orbit boring software on the BMC-1000 at SPM’s factory.  Ohki testified that this was the first time he had attempted to combine Hale Interpolation and Archimedes Interpolation to create the orbit boring function on a BMC-1000. He was unable to make the software perform to SPM’s requirements and returned to Japan. 

Soon after Ohki left SPM, Toshiba’s Steve Oliphant sent a memorandum to Tony Tani, Toshiba’s assistant general manager, raising several issues related to the BMC-1000.  Oliphant wrote:

SPM is a Beta site for this very unique [orbit boring] software.

Orbit Boring vs Hale Interpolation:  There seems to be some confusion as to the definition and capabilities of these two programs.  In the beginning we were told that the Orbit Boring option was available and process descriptions were supplied to the field.  This was sold to SPM . . . .  What further complicates this definition issue is that Mr. Oki [sic] told [Maruka] that Orbit and Hale were two different things and that the BMC1000 was not capable of Orbit. 

On May 8, 1998, SPM complained that the BMC-1000 did not perform as expected and requested written confirmation that the machine could produce fluid ends.  Toshiba replied that Ohki would return to Fort Worth later in May and again attempt to install the orbit boring software.  Ohki returned to SPM on May 18, but still the BMC-1000 could not perform internal contouring.  Around the same time, SPM offered to return the machine to Toshiba in exchange for a refund of its down payment if Toshiba had any concern about the BMC-1000's ability to perform.  Toshiba promised that a software solution was imminent.

Meanwhile, SPM ordered a second machine tool from Toshiba in late July.  This second tool, the BMC-800, was slightly smaller than the BMC-1000 but had the same purported functionality—including orbit boring.  Toshiba advised SPM that it would not ship the BMC-800 until SPM paid the $742,500 balance due on the BMC-1000.  On August 10, SPM paid the BMC-1000 balance.  

Five days later, Toshiba sent SPM an “acceptance” of the BMC-800 purchase order.  The acceptance stated that “there is no orbit boring software” and “there will never be any revisions or updates” to the software provided with the BMC-800.  When SPM confronted Toshiba about these statements, Toshiba dismissed them as a miscommunication.  Toshiba said it planned to showcase the orbit boring software along with the new NX-76 at a Chicago tool show in September.  SPM would receive the software immediately after the show, promised Toshiba. 

SPM sent a representative to the Chicago tool show.  Toshiba did exhibit orbit boring on the new NX-76, but told SPM’s representative that the NX-76 software would not be available for the BMC-1000 until January. 

SPM and Toshiba continued to wrangle over the BMC performance issues, and especially the orbit boring software, for another year.  As late as May 13, 1999, Toshiba’s Oliphant sent a memorandum to SPM promising delivery of the orbit boring software within two months.  SPM, Maruka, and Toshiba scheduled a meeting at SPM’s factory for August 1999.  At the meeting, Toshiba definitively announced that SPM would not receive the orbit boring software. 

From June 1998, when the BMC-1000 became operational at SPM, until November 2001, SPM used the Toshiba machines extensively to help make fluid ends.  Although the lack of orbit boring software made the Toshibas useless for internal contouring, they could be used for rough machining.  Using the Toshiba machines for 15,000 hours in conjunction with 18,600 hours on other machines, SPM produced 344 fluid ends at the average rate of 100 hours per fluid end—down from 115 hours per fluid end before the Toshibas went online, but far longer than the fifteen to fifty hours predicted by Toshiba.

When Toshiba announced that SPM would not receive the orbit boring software, SPM began to shop for machines to replace the Toshibas.  In May 2000, SPM purchased the first of two machine tools from Toshiba rival Goss Trevisan.  The first Goss went online in July 2000.  A second Goss went online in May 2001.  In November 2001, SPM stopped using the Toshiba machines altogether.  SPM offered testimony at trial that the Goss machines could produce a complete fluid end in thirty-four hours. 

In February 2000, SPM sued Toshiba for fraud, negligent misrepresentation, breach of contract and breach of warranty.
(footnote: 1)  Toshiba counterclaimed for the unpaid balance of the BMC-800. 

The case was tried to a jury.  SPM claimed three broad categories of damages:  refund of the $898,200 SPM paid for the two Toshiba machines; $969,945 in incidental expenses for items such as pouring foundations for the Toshiba machines and time spent designing tools for the Toshiba machines; and $6,038,492 in lost profits. 

The jury returned a verdict in favor of SPM on every cause of action.  SPM elected to recover on the basis of its breach of contract claim, for which the jury awarded SPM $3,003,613 for each machine, for a total of $6,007,226.  The issue of attorney’s fees was submitted to the trial court by agreement of the parties.  The trial court found that SPM was entitled to $1.5 million in attorney’s fees through the date of judgment, plus additional fees if Toshiba unsuccessfully appealed the trial court’s judgment.  The trial court also found that SPM was entitled to prejudgment interest beginning on the day SPM filed suit through the date of judgment.  Both parties appealed.

Discussion

Toshiba’s Issues

Did SPM accept the machines as a matter of law? 

A threshold question in this case, and key to several of Toshiba’s issues, is whether SPM accepted or rejected the Toshiba machines.  The jury found that SPM accepted but later revoked its acceptance of the BMC-1000 and failed to find that SPM accepted the BMC-800.  In its second issue, Toshiba argues that there is no evidence to support the jury’s finding that SPM revoked its acceptance of the BMC-1000, and there is conclusive evidence that SPM accepted the BMC-800.  The gist of Toshiba’s argument is that SPM’s extensive use of the BMC machines—17,000 hours of use over four years—constitutes acceptance and precludes revocation of acceptance as a matter of law.  We disagree.

Standards of review

No evidence

We review the jury’s finding that SPM revoked its acceptance of the BMC-1000 under the “no evidence” standard.  In determining a “no evidence” issue, we are to consider only the evidence and inferences that tend to support the finding of the disputed fact and disregard all evidence and inferences to the contrary.  
Bradford v. Vento, 
48 S.W.3d 749, 754 (Tex. 2001)
; Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996);
 In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cont’l Coffee
, 937 S.W.2d at 450;
 Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).  A “no evidence” issue may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999).

Matter of law

We review the jury’s failure to find that SPM accepted the BMC-800 under the “as a matter of law” standard.  When an appellant attacks the legal sufficiency of an adverse answer to an issue on which he had the burden of proof, the appellant must overcome two hurdles.  
Victoria Bank & Trust Co. v. Brady
, 811 S.W.2d 931, 940 (Tex. 1991).  First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary.  
Dow Chem. Co. v. Francis
, 46 S.W.3d 237, 241 (Tex. 2001).  Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law.
  Id.
; 
Sterner v. Marathon Oil Co.
, 767 S.W.2d 686, 690 (Tex. 1989).  The issue should be sustained only if the contrary proposition is conclusively established.  
Dow Chem
., 46 S.W.3d at 241-42.

Analysis

Where goods fail to conform to the contract, the buyer may reject or accept the goods.  
Tex. Bus. & Com. Code Ann.
 § 2.601 (Vernon 1994).  A buyer’s rejection or acceptance of nonconforming goods determines the  remedies available him.  
Id. 
§§ 2.711, 2.714 (Vernon 1994); 
Southwestern Bell Tel. Co. v. FDP Corp.
, 811 S.W.2d 572, 576 (Tex. 1991) (op. on reh’g); 
Paul Mueller Co. v. Alcon Labs., Inc.
 993 S.W.2d 851, 855 (Tex. App.—Fort Worth 1999, no pet.).

A buyer accepts goods if he agrees to accept them despite their nonconformity, fails to make an effective rejection, or does any act inconsistent with the seller’s ownership.  
Tex. Bus. & Com. Code Ann.
 
§ 2.606 (Vernon 1994).  Where a buyer accepts goods with knowledge of a non-conformity, the buyer may not revoke acceptance unless the acceptance was made on the reasonable assumption that the non-conformity would be seasonably cured.  
Id.
 
§§ 2.607(b), 2.608(a)(1) (Vernon 1994).  Where a buyer accepts goods without knowledge of a non-conformity, the buyer may revoke its acceptance if acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller’s assurances.  
Id.
 § 2.608(a)(2).

Rejection of goods must occur within a reasonable time after their delivery.  
Id
.
 § 2.602(a) (Vernon 1994).  Likewise, revocation of acceptance must occur a reasonable time after the buyer discovers the grounds for revocation. 
 Id
.
 § 2.608(b).  Whether rejection or revocation occurred within a reasonable time depends on the facts of a particular case.  
Id
.
 § 1.205(a) (Vernon Supp. 2004-05) (providing that “[w]hether a time for taking an action required by this title is reasonable depends on the nature, purpose, and circumstances of the action.”);
 Purnell v. Guar. Bank
, 624 S.W.2d 357, 359 (Tex. App.—Dallas 1981, writ ref’d n.r.e.) (holding that whether thirty-month delay precluded revocation of acceptance of defective pleasure boat was a fact question); 
Don’s Marine, Inc. v. Haldeman
, 557 S.W.2d 826, 829 (Tex. App.—Corpus Christi 1977, writ ref’d n.r.e.).

After rejection or revocation of acceptance, any exercise of ownership by the buyer with respect to the goods is wrongful as against the seller.  
Tex. Bus. & Com. Code Ann.
 § 
2.602(b)(1).

As noted above, the gist of Toshiba’s argument is that SPM’s extensive use of the BMC machines—17,000 hours of use over four years—constitutes acceptance and precludes revocation of acceptance as a matter of law.  According to Toshiba, use equals irrevocable acceptance because it is an act inconsistent with Toshiba’s ownership under § 2.606(a)(3) and a wrongful exercise of ownership under § 2.602(b)(1).  Toshiba cites several Texas and foreign cases to support its argument.  Generally, these cases stand for the proposition that a buyer who exercises dominion and control over nonconforming goods accepts those goods.
  See
, 
e.g.
, 
Bacchus Indus., Inc. v. Frontier Mech. Contractors
, 36 S.W.3d 579, 585 (Tex. App.—El Paso 2000, no pet.) (holding that buyer who made substantial repairs and modifications to air conditioning units accepted them as a matter of law); 
Danjee, Inc. v. Addressograph Multigraph Corp.
, 262 S.E.2d 665, 669-70 (N.C. Ct. App. 1980) (stating in dicta that revocation not available to buyer who, with full knowledge of defects, used printing presses for a “long period of time” and never attempted to reject them or revoke acceptance);
 Explorers Motor Home Corp. v. Aldridge
, 541 S.W.2d 851, 853-54 (Tex. App.—Beaumont 1976, writ ref’d n.r.e.) (holding that buyers who traveled 14,000 miles in motor home over two years did not effectively reject the motor home); 
Bowen v. Young
, 507 S.W.2d 600, 603-04 (Tex. App.—El Paso 1974, no writ) (holding that buyer who moved into nonconforming mobile home and converted its heater from electric to gas accepted the home as a matter of law).

But the cases cited by Toshiba do not give a complete answer to the question of whether “use equals acceptance” under the UCC.  Most courts have indicated that whether the buyer’s continued use of goods undoes a purported rejection or revocation of acceptance depends upon whether the use was reasonable. 
 
Anderson on the Uniform Commercial Code
, § 2-608:281 (2004); 
Williston on Contracts
, 
§§ 40:19, 40:30 (4th ed.).  What constitutes reasonable use is a question of fact to be decided under the circumstances of each case, but courts generally hold that using goods during the time when the seller is promising or trying unsuccessfully to cure the nonconformity will not adversely affect the buyer’s rights.  
Williston on Contracts
, 
§ 40:30
; see Aluminum Line Prods. Co. v. Rolls-Royce Motors, Inc.
, 649 N.E.2d 887, 894 (Ohio Ct. App. 1994) (holding that buyer was not precluded from revoking acceptance of automobile after three years and 15,000 miles of use when seller made repeated attempts to repair the vehicle, and buyer’s continued use after revocation did not undo revocation);
(footnote: 2) 
N.
 
Am. Lighting, Inc. v. Hopkins Mfg., Inc.
, 37 F.3d 1253, 1258-59 (7th Cir. 1994) (holding seller’s repeated promises to update software for headlight testing apparatus justified buyer’s use of apparatus during two-year delay in revoking acceptance);
 Wilk Paving, Inc. v. Southworth Milton, Inc.
, 649 A.2d 778, 782 (Vt. 1994) (holding buyer’s continued use of asphalt paving machine after revocation of acceptance was reasonable where the seller continued to assure buyer that seller could repair machine)
; 
Four Sons Bakery, Inc. v. Dulman
, 542 F.2d 829, 832 (10th Cir. 1976) (holding seller’s repeated assurances that it would fix commercial oven justified continued use of oven after revocation of acceptance).  As the Seventh
 Circuit held in 
North American Lighting
, a “use equals acceptance” argument

comes dangerously close to suggesting a rule that would allow sellers to ‘lock in’ purchasers of goods by promising them the moon—only to bring them back to earth when they attempted to

revoke the acceptance that they were persuaded to give because of their failure to fully understand a substantial defect.

N. Am. Lighting
, 37 F.3d at 1258-59.  

Other factors relevant to a buyer’s reasonable use of nonconforming goods include the degree of economic hardship the buyer would suffer if it discontinued using the defective goods and the reasonableness of the buyer’s use after revocation as a method of mitigating damages.  
Liarikos v. Mello
, 639 N.E.2d 716, 719 (Mass. 1994) (holding that continued use of automobile after revocation of acceptance was reasonable where buyer relied on car to run her business).  Use of nonconforming goods may be the most appropriate means of achieving mitigation until the buyer can obtain suitable replacements.  
Fablok Mills, Inc. v. Cocker Mach. & Foundry Co.
, 310 A.2d 491, 494 (N.J. Super. Ct. App. Div. 1973) (holding two-year delay in revocation of acceptance and extensive use by buyer of defective knitting machines was reasonable, during which seller attempted to fix the machines on many occasions); 
see Deere & Co. v. Johnson
, 271 F.3d 613, 619-20 (5th Cir. 2001) (applying Mississippi law and holding that farmer’s continued use of defective tractor after revoking acceptance was reasonable because tractor was essential to farmer’s work, replacement was difficult to obtain, and farmer mitigated his damages by using the tractor).

In our case, Toshiba agreed to provide the orbit boring function with both BMC machines.  SPM’s president, Dan Lowrance, testified that Toshiba delivered the BMC-1000 in March 1998 without the software needed to perform orbit boring.  Lowrance testified that SPM asked Toshiba about the missing orbit boring software soon after the machine arrived.  According to Lowrance, Toshiba assured SPM that its programmer would travel to SPM’s factory “very quickly” and install the software.  Toshiba’s programmer attempted but failed to install the software in April 1998 and again in May. Lowrance testified that after the programmer’s first attempt, Lowrance told Toshiba’s assistant general manager, Tony Tani, that SPM would return the BMC-1000 for a refund if Toshiba had any doubt about its ability to make fluid ends.  Chris Wall, SPM’s director of manufacturing, admitted that SPM accepted the BMC-1000 when it paid the $742,500 balance due, but Lowrance testified that SPM paid the balance only because Toshiba assured SPM that resolution of the orbit boring problem was “right around the corner” and refused to ship the BMC-800 otherwise.   

Toshiba delivered the BMC-800 in September 1998.  Lowrance testified that Toshiba’s Steve Oliphant told him that SPM would receive the orbit boring software immediately following the debut of the NX-76 in Chicago that same month.  Chris Wall testified that Oliphant told him on September 18, 1998 that Toshiba was working on the orbit boring software and would deliver it in January of the following year.  On May 13, 1999, Oliphant sent a memo to SPM’s George Reeve in which he stated that Toshiba would deliver orbit boring software within two months.  Gene Burkes, general manager of Maruka U.S.A., testified that he called Oliphant on SPM’s behalf at least a dozen times between January and May 1999.  According to Burkes, Oliphant “kept saying the software is coming.”  In August 1999, Toshiba announced that it would not deliver orbit boring software to SPM. 

Ray Gilbert, SPM’s vice president of finance, testified that the BMC machines were worthless to SPM without the orbit boring function. Nevertheless, as detailed later in this opinion under the issues of damages and mitigation, SPM cut the time needed to make a fluid end from 115 hours to 100 hours by making what use it could of the BMC machines, though the production time was far longer than the fifteen to fifty hours SPM expected to achieve.  It is undisputed that SPM used the BMC machines for 17,000 hours.

We note that it is unclear from the record when and how SPM notified Toshiba that it was revoking its acceptance of the BMC-1000 and rejecting the BMC-800.  But Toshiba does not complain of lack of notice, so we will not dwell on this point.

We turn to the question of SPM’s revocation of acceptance of the BMC-1000 under section 2.608.  The non-conformity identified by SPM was the lack of the orbit boring function.  Gilbert testified that the lack of orbit boring substantially impaired the BMC-1000's value to SPM.  The jury could reasonably conclude that SPM did not discover the non-conformity until Toshiba announced in August 1999 that it would not deliver the orbit boring software, and that SPM’s failure to discover the non-conformity was induced by Toshiba’s many assurances that it would deliver the orbit boring software.  Both Toshiba’s assurances and SPM’s use of the BMC-1000 to mitigate its damages until it could obtain replacements tend to support the conclusion that SPM’s extensive use of the BMC-1000 was reasonable, before and after SPM revoked its acceptance.  Moreover, Chris Wall testified that replacement machines suitable to SPM’s needs were not easy to obtain, and the replacement machines SPM ultimately bought had a long lead time.  Whether SPM’s use of the BMC-1000 was reasonable was a fact question for the jury to decide.   The evidence supports the conclusion that SPM’s use was reasonable.  We hold that there was more than a scintilla of evidence to support the jury’s finding that SPM revoked its acceptance of the BMC-1000.

With regard to the BMC-800, the same factors—Toshiba’s repeated assurances of an imminent fix, SPM’s use of the BMC-800 to mitigate its damages, and the difficulty of obtaining replacement machines—tend to justify SPM’s use of, and delay in rejecting, the BMC-800.  We hold that there is more than a scintilla of evidence to support the jury’s failure to find that SPM accepted the BMC-800.

We overrule the part of Toshiba’s second issue that concerns acceptance of the BMC machines (the same issue raises other complaints, which we address in the next section of this opinion).  This conclusion is the starting point for our analysis of Toshiba’s other issues.

Did Toshiba breach the contracts? 

Also in its second issue, Toshiba contends that even if SPM rejected the machines, there is no evidence that Toshiba breached sales contracts.  Toshiba argues that its failure to deliver orbit boring software cannot give rise to a breach of contract claim and that there is no evidence to support the jury’s finding that Toshiba breached the contracts.  As a subissue, Toshiba argues that Addendum A to the BMC-1000 contract was not a part of the agreement between Toshiba and SPM and therefore could not give rise to a breach of contract claim.

Was Addendum A part of the contract?

The jury found that Toshiba and SPM intended to “bind themselves to an agreement regarding the BMC-1000 that included all provisions contained in Addendum A” to SPM’s purchase order.  Toshiba argues that there is no evidence to support the jury’s finding.

Toshiba relies on section 2.207 of the Texas Business and Commerce Code.  
Tex. Bus. & Com. Code Ann.
 § 2.207 (Vernon 1994).  Section 2.207, captioned “Additional Terms in Acceptance or Confirmation” and often referred to as the “battle of the forms” section of the UCC, provides in part as follows:

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(b) The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:

(1) the offer expressly limits acceptance to the terms of the offer;

(2) they materially alter it; or

(3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.  In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

Significantly, Toshiba does not argue that Maruka’s December 16, 1997 proposal to SPM was an offer.  Nor does Toshiba point to any other writing that it claims was an offer accepted by SPM’s purchase order.  Rather, Toshiba contends that this case is governed by section 2.207(c); according to Toshiba, the writings of the parties do not establish a contract.

Toshiba’s argument fails because SPM’s purchase order was an offer to buy the BMC-1000.  The “Terms and Conditions of Purchase” recited on the back of the purchase order state that Toshiba’s shipment of the BMC-1000 constitutes acceptance of the purchase order.  Therefore, Toshiba accepted the purchase order when it shipped the BMC-1000 to SPM.  The “Terms and Conditions of Purchase” also state that acceptance of the purchase order is acceptance of all terms on the front and back of the purchase order.  And the merger clause on the back of the purchase order recites that “[t]his purchase order,
 and any documents referred to on the face hereof
, constitute the entire agreement between the parties.”  (Emphasis added.)  The front of the purchase order specifically refers to Addendum A.  George Reeve, the SPM employee who generated the purchase order and Addendum A, testified that he discussed the specific terms of the addendum with Toshiba’s Oliphant and Maruka’s Davenport during a three-hour phone conference on December 9, 1998  and that Toshiba never objected to the Addendum A terms after it received the purchase order.  We hold that SPM adduced more than a scintilla of evidence to support the jury’s finding that Addendum A was part of the contract.

Is there any evidence of breach?

Next, Toshiba argues that there is no evidence to support the jury’s finding that it breached the contracts.  In the same subissue, Toshiba claims that its delivery of the BMC machines to SPM precludes a breach of contract claim, even if the machines were missing critical features.  We disagree.

The remedies available to a buyer under the UCC depend on whether the buyer accepts or rejects the goods in question.  
See
 
Tex. Bus. & Com. Code Ann. §
§ 2.711, 2.714.  If a buyer rejects goods (or revokes acceptance), the buyer is entitled to the remedies set forth in sections 2.711 and 2.713.  
Id.
 § 2.713 (Vernon 1994).  If, on the other hand, a buyer accepts goods, the buyer’s remedy is determined by section 2.714.  Because a buyer cannot accept what a seller does not deliver, delivery of goods is a necessary predicate to acceptance or rejection; but delivery by itself does not determine the buyer’s remedies.  Assuming the seller delivers 
something
, the buyer’s acceptance or rejection determines the buyer’s remedies.

It is undisputed that Toshiba delivered the BMC machines to SPM.  The jury found that SPM rejected the BMC-800 and revoked its acceptance of the BMC-1000.  The question, then, is whether SPM produced any evidence to support the jury’s finding that Toshiba breached the contracts.

A seller breaches a contract if its delivery fails in any respect to conform to the contract.  
Id.
 § 2.601.  This is sometimes referred to as the “perfect tender” rule.  
Tex. Imps. v. Allday, 
649 S.W.2d 730, 737 (Tex. App.—Tyler 1983, writ ref’d n.r.e.).  Conformity does not mean substantial performance; it means complete performance.  
Printing Ctr., Inc. v. Supermind Publ’g Co., 
 669 S.W.2d 779, 783 (Tex. App.—Houston [14th Dist.] 1984, no writ).

SPM identifies four specific contract items that Toshiba failed to deliver:  the orbit boring software, tool lists and part programs, process cycle time studies, and a test run-off of a fluid end.  SPM offered evidence that Toshiba failed to deliver these items.  Except for the orbit boring software, Toshiba does not dispute its failure to deliver these items.  Therefore, SPM produced at least some evidence to show that Toshiba’s delivery did not conform to the contract in all respects.

We hold that Toshiba’s delivery of the BMC machines does not preclude SPM’s beach of contract claims and that there is some evidence to support the jury’s findings that Toshiba breached the contracts.  We overrule Toshiba’s second issue.

Damages

Toshiba’s first, fourth, sixth, seventh, and eleventh issues complain about  various aspects of SPM’s damages.

Is there any evidence to support SPM’s lost profits? 

In issue 7a,
(footnote: 3) Toshiba complains that there is no evidence to support SPM’s claim of lost profits.  In its closely-related issue 4, Toshiba complains that the trial court erred by admitting the testimony of SPM’s damage witness, Ray Gilbert, on the question of lost profit.  We disagree.

A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty.  
Szczepanik v. First S. Trust Co.
, 883 S.W.2d 648, 649 (Tex. 1994);
 VingCard A.S. v. Merrimac Hospitality Sys., Inc.
, 59 S.W.3d 847, 863 (Tex. App.—Fort Worth 2001, pet. denied).  While this test is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise, at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.  
Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.
, 877 S.W.2d 276, 279 (Tex. 1994); 
Szczepanik
, 883 S.W.2d at 649; 
VingCard A.S.
, 59 S.W.3d at 863.  In other words, “reasonable certainty” is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises.  
Teletron Energy Mgmt., Inc.
, 877 S.W.2d at 279-80; 
VingCard A.S.
, 59 S.W.3d at 863.  The mere assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits.  
Holt Atherton Indus., Inc. v. Heine
, 835 S.W.2d 80, 85 (Tex. 1992).  Whether evidence is speculative or reasonably certain is a factual issue within the exclusive province of the jury to determine. 
 VingCard A.S., 
59 S.W.3d at 863.  Reasonably certain lost profits may be proved by relying on such factors as (1) the experience of the business principals, (2) the nature of the business, (3) the nature of the market, (4) the nature of the client base, (5) the sales force, (6) the marketing plan, and (7) the company's track record of sales.  
Id
. at 864.  For example, when a business is already established and making a profit at the time the contract was breached or the tort committed, pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost.  
Teletron Energy Mgmt., Inc.
, 877 S.W.2d at 279; 
Anthony Equip. Corp. v. Irwin Steel Erectors, Inc
., 115 S.W.3d 191, 204 (Tex. App.—Dallas 2003, pet. dism’d).
 Ray Gilbert, SPM’s vice president of finance, was SPM’s sole witness on damages.  To begin our analysis, we will summarize Gilbert’s testimony on the question of SPM’s lost profits.

Gilbert broke SPM’s lost profits into three components.  First was the increased cost of producing the 344 fluid ends SPM made in part on the Toshiba machines.  Gilbert testified that it took SPM 34,025 hours to produce the 344 fluid ends.  From that he subtracted 12,040 hours, the time it would have taken to produce 344 fluid ends if the Toshiba machines could produce a fluid end in thirty-five hours.  Gilbert then multiplied the remainder, 21,985 hours, by SPM’s “shop rate” of $150 per hour, for a total of $3,297,750. 
Gilbert testified that $150 per hour was the industry standard shop rate; he also produced calculations to show that the shop rate was reasonably accurate for SPM. 

Gilbert’s second category of lost profits stemmed from the sales of 296 fluid ends SPM lost because it quoted prices too high or delivery times too long to suit its customers.  Gilbert testified that SPM lost these sales “because the Toshibas didn’t perform as represented and we had to quote longer deliveries and our prices were not competitive because instead of doing it in 35 hours, we were up closer to 100 hours.”  He personally contacted customers who cancelled orders or rejected SPM quotes to ascertain whether the cancellation or rejection was due to SPM’s price or delivery time.  Gilbert then multiplied the gross sales lost because of price or delivery time by SPM’s 28.68% profit margin to compute SPM’s net lost profits.  Gilbert derived the profit margin from SPM’s consolidated financial statements for the years 1994 through 2001.  While Gilbert admitted that he did not know precisely what price or delivery time SPM would have had to quote to make the sales in question, he opined that SPM would have made the sales if the Toshiba machines could make a fluid end in thirty-five hours.  He attributed a total of $2,362,821 in lost profits to lost fluid end sales. 

Gilbert’s third category of lost profit arose from lost sales of flow control products—valves, piping, and connections—that SPM would have sold as part of its lost fluid end sales.  Gilbert examined SPM’s sales history to determine which customers typically purchased flow control products along with pumps and fluid ends.  He testified that the fluid end sales SPM lost to those customers would have generated additional sales of $1,317,022 in flow control products.  Gilbert multiplied the lost flow control sales by SPM’s 28.68 percent profit margin for a lost net profit of $377,721. 

Finally, Gilbert testified that SPM had the same customer base for decades.  SPM sold the same product lines “for some time,” and those product lines had always been profitable.  He testified that SPM has turned a profit since at least 1991, the year Gilbert joined the company. 

Toshiba challenges Gilbert’s testimony on three grounds.  First, Toshiba argues that Gilbert did not qualify as an expert.  A witness is qualified to testify as an expert if he has the appropriate knowledge, skill, experience, training, or education.  
Roberts v. Williamson
, 111 S.W.3d 113, 121 (Tex. 2003); 
Tex. R. Evid.
 702. The decision to admit expert testimony is within the trial court’s discretion and will be disturbed on appeal only if there has been an abuse of that discretion.
  Gammill v. Jack Williams Chevrolet, Inc.
, 972 S.W.2d 713, 718-19 (Tex. 1998).  In this case, the specific subject matter of Gilbert’s testimony is SPM’s damages arising from its purchase of the Toshiba machines.  The question we consider is whether Gilbert has specialized knowledge that would assist the jury in understanding that issue.  
See Helena Chem. Co. v. Wilkins
, 47 S.W.3d 486, 500 (Tex. 2001).

Gilbert earned a BBA in accounting in 1968.  From 1968 to 1991 he worked as an accountant, controller, and vice president of sales and finance for several companies.  In 1991, Gilbert went to work for SPM, first as vice-president and general manager with full responsibility for SPM’s manufacturing, sales, marketing, and accounting, then gradually narrowing his focus to sales and accounting as SPM’s vice president of finance.  He testified that he had more than thirty years’ experience managing the financial and accounting functions of companies engaged in the manufacture and distribution of various products.  After reviewing Gilbert’s testimony about his education, work history, experience, and familiarity with SPM’s business, we cannot say that the trial court abused its discretion by allowing Gilbert to testify as an expert about SPM’s damages.

Second, Toshiba argues that the trial court erred by admitting Gilbert’s testimony about lost sales because it was rife with inadmissible hearsay.  Gilbert testified that he personally contacted SPM customers to ascertain why certain sales were lost or certain orders cancelled.  Toshiba made timely hearsay objections to Gilbert’s testimony.

We review a trial court’s rulings in admitting or excluding evidence under an abuse of discretion standard.  
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527 (Tex. 2000).  We must uphold the trial court’s evidentiary ruling if there is any legitimate basis in the record for the ruling.  
Owens-Corning Fiberglas Corp. v. Malone
, 972 S.W.2d 35, 43 (Tex. 1998).

An expert may rely on inadmissible facts or data to form an opinion or inference if the facts or data are of a type reasonably relied upon by experts in the particular field.  
Tex. R. Evid.
 703; 
In re A.J.L.
, 136 S.W.3d 293, 301 (Tex. App.—Fort Worth 2004, no pet.).  We cannot think of a more appropriate method to determine why sales were lost than to ask the customer.  We hold that the trial court did not abuse its discretion by admitting this testimony.

Finally, Toshiba argues that Gilbert’s testimony about lost sales was purely speculative because Gilbert failed to determine what price or delivery time would have induced SPM’s customers to buy fluid ends from SPM.    We find no case law to support Toshiba’s argument.  Measuring lost profits is an inherently speculative undertaking.  
Pena v. Ludwig,
 766 S.W.2d 298, 301 (Tex. App.— Waco1989, no writ).  In 
Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc., 
the Supreme Court of Texas held that a hypothetical bid for a construction project was “entirely speculative” and legally insufficient to support an award of lost profits because there was no evidence that the bid would have been accepted.  960 S.W.2d 41, 50 (Tex. 1997).  But our case is readily distinguishable from 
Formosa Plastics
.  In that case, there was evidence that two of the three other bids on the same project were lower than the claimant’s hypothetical bid; thus, the alleged lost profits “were based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated.”  
Id.
  There is no such evidence in our case.  Moreover, the lost sales to which Gilbert testified concerned the loss of sales of proven products to existing customers.  We hold that Gilbert’s testimony regarding lost sales was not so speculative as to be legally insufficient.

In sum, Gilbert testified that SPM lost profits of $6,038,292.  As noted above, SPM also claimed $970,000 in incidental damages.  The jury awarded SPM a total of $6,007,226 on its breach of contract claims.  Even if we assume that the jury based its award solely on SPM’s lost profits, we hold that Gilbert’s testimony presented more than a scintilla of evidence to support the jury’s verdict.  Gilbert’s testimony established SPM’s lost profits to a reasonable certainty.  We overrule Toshiba’s issues 4 and 7a.

Did SPM’s damage model result in a double recovery? 

In its sixth issue, Toshiba argues that two of SPM’s damage elements—lost profits due to increased production costs and lost profits due to lost sales—overlap, and to allow SPM to recover both results in an impermissible double recovery.  We disagree.

Toshiba argues, and we agree, that both of Gilbert’s lost profit calculations hinge on the speed of the Toshiba machines.  As detailed above, SPM’s Gilbert testified that SPM incurred more costs and lost profits on the fluid ends actually produced because the Toshiba machines were slower than expected.  Likewise, SPM lost sales because it quoted higher prices and longer delivery times to its customers based on the slower than expected speed of the Toshiba machines.  Had the machines performed as expected, SPM would have realized a higher profit on the fluid ends actually made and sold
 and
 realized additional sales.  But we disagree with Toshiba that the fact that both damage elements arise from the speed of the Toshiba machines necessarily means that the elements overlap.

To show that the elements overlap, Toshiba argues that the extra hours needed to make the fluid ends actually produced are the same hours SPM would have used to make additional fluid ends for additional sales.  This may be true, but it misses the point.  Toshiba confuses the issues of time and profit.  The hours might be the same, but the dollars are different.  Under Gilbert’s analysis, if the Toshiba machines had performed as expected, SPM would have saved time and realized more profit on each of the fluid ends actually produced.  With the time saved, SPM could also have made and sold more fluid ends and made additional profit.  The time used to make fluid ends is the same, but the lost profits are separate and distinct.

We overrule Toshiba’s issue six.

Did the trial court err by submitting broad-form damage questions? 

In its eleventh issue, Toshiba argues that the trial court erred in failing to submit damage questions that provided separate blanks for each element of SPM’s damage model.  We disagree.

Toshiba’s complaint about the damage submission turns on the proposition that a trial court commits reversible error where it submits a broad-form damage issue that incorporates an element of damages on which there is no evidence.  
Harris County v. Smith
, 96 S.W.3d 230, 234 (Tex. 2002).  Such a submission prevents the appellate court from determining whether the jury based its verdict on an improperly submitted element of damage.  
Id.
  Toshiba identifies lost profits as the element of damage lacking evidentiary support.

Toshiba’s argument fails because we have already concluded that there is legally sufficient evidence to support the jury’s award, even if the entire award consists of lost profits.  We overrule Toshiba’s eleventh issue.

May SPM recover both its purchase money and consequential damages?

In its first issue, Toshiba argues that a party claiming breach of contract may not recover both the purchase money paid under the contract—what Toshiba calls “rescission damages”—and consequential damages.  But SPM’s purchase money was not submitted to the jury as an element of SPM’s contract damages.  Therefore, Toshiba’s first issue is moot, and we need not consider it.  
See 
Tex. R. App. P. 47.1.

Did SPM fail to mitigate its damages? 

In issue 7b, Toshiba argues that the trial court erred by awarding damages that SPM could have avoided by cover or mitigation.  Toshiba claims that SPM did nothing to mitigate its losses and therefore is barred from recovering any consequential damages.

A buyer may recover consequential damages that could not reasonably be prevented by cover.  
Tex. Bus. & Com. Code Ann.
 § 2.715(b)(1) (Vernon 1994).  After a breach by the seller, the buyer may “cover” by making, in good faith and without unreasonable delay, any reasonable purchase of goods in substitution for those due from the seller.  
Id.
 § 2.712(a).  To determine if a buyer effected a proper attempt at cover, we consider “whether at the time and place the buyer acted in good faith and in a reasonable manner . . . .”  
Id.
 § 2.712, cmt 2.  “[I]t is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.” 
 Id
.  The burden of establishing that damages could not have been reasonably prevented by cover is on the plaintiff.  
Wilson v. Hays
, 544 S.W.2d 833, 836 (Tex. Civ. App.—Waco 1976, writ ref’d n.r.e.).

Mitigation of damages is a rule requiring the injured party to use reasonable diligence to minimize his damages.
  LTV Aerospace Corp. v. Bateman
, 492 S.W.2d 703, 709 (Tex. Civ. App.—Tyler 1973, writ ref’d n.r.e.).  Though mitigation is similar to cover, the burden of disproving mitigation lies with the defendant.

The trial court submitted the issues of cover and mitigation to the jury as limiting instructions on the breach of contract damage questions, as follows:

Do not include in your answers any loss you find SPM could have avoided by the exercise of reasonable care.  Do not include in your answer any loss that occurred after the date that replacement machining centers could have been reasonably obtained and installed by SPM. 

Toshiba’s argument on cover amounts to a no-evidence issue; its argument on mitigation is a conclusive evidence issue.  Under either standard, we must affirm if there is more than a scintilla of evidence in SPM’s favor.

With regard to cover, SPM produced evidence at trial to show that it purchased two Goss Trevisan machines as cover when it became clear that the Toshiba machines would not perform as represented.  Once both Goss Trevisan machines were fully operational, SPM stopped using the Toshiba machines.  This is some evidence of that SPM made reasonable efforts to limit its consequential damages and is enough to support the jury’s award.

With regard to mitigation, SPM produced evidence to show that it limited its damages by using the Toshiba machines to the extent possible.  Although the Toshiba machines did not perform as expected, they cut the time it took SPM to make a fluid end from 115 hours to 100 hours.  This fifteen hour savings, when multiplied by SPM’s shop rate of $150 per hour, yielded a reduction in SPM’s damages of $2,250 per fluid end.  Gilbert’s damage computation properly accounted for this savings.

Toshiba argues that by using the Toshiba machines, SPM aggravated its damages, not mitigated them.  Toshiba reasons that SPM’s damage model multiplied the number of hours SPM used the Toshiba machines by the shop rate; thus every hour SPM used the Toshiba machines increased SPM’s damages by $150.  But SPM claimed no such thing.  SPM claimed as damages the difference between 100 hours—the time it actually took a make a fluid end with the help of the Toshiba machines—and thirty-five hours—the time Toshiba said it would take the machines to make a fluid end—and multiplied the difference by SPM’s $150 per hour shop rate.  If SPM had not used the Toshiba machines, its damages would have been the difference between 115 hours and thirty-five hours, multiplied by the $150 per hour shop rate.  Thus, by using the Toshiba machines, SPM mitigated its damages by $2,250—15 hours times the shop rate—for every fluid end produced.

We hold that SPM presented some evidence on the question of cover and that Toshiba failed to prove conclusively that SPM did not mitigate its damages.  We overrule Toshiba’s issue 7b.

Did the trial court err in awarding attorney’s fees to SPM? 

In its eighth issue, Toshiba complains that the trial court erred by awarding attorney’s fees to SPM.  Toshiba’s complaint has two components:  First, that SPM is not entitled to attorney’s fees because it did not prevail on its breach of contract claim; and second, that the trial court impermissibly enhanced SPM’s “lodestar” attorney’s fees.

A party may recover reasonable attorney’s fees for a valid breach of contract claim.  
Tex. Civ. Prac. & Rem. Code Ann.
 § 38.001 (Vernon 1997).  Texas courts weigh the eight factors recited in rule 1.04 of the rules of professional conduct to determine the reasonableness and necessity of attorney’s fees.  
Tex. Disciplinary R. Prof'l Conduct 
1.04(b), reprinted in 
Tex. Gov't Code Ann.
, tit. 2, subtit. G, app. A (Vernon 2005) (
Tex. State Bar R.
 art. X § 9); 
Miller v. Kennedy & Minshew, Prof. Corp.,
 142 S.W.3d 325, 336-37 (Tex. App.—Fort Worth 2003, pet. denied).  Those factors are  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. 
Miller,
 142 S.W.3d at 336-37.  One method of computing a reasonable fee is the “lodestar” method, or “the product of reasonable hours times a reasonable rate.”  
City of Burlington v. Dague
, 505 U.S. 557, 559, 112 S. Ct. 2638, 2640 (1992).  We review a court-ordered award of attorney’s fees under the abuse of discretion standard.  
Ridge Oil Co., Inc. v. Guinn Invs., Inc.,
 148 S.W.3d 143, 163 (Tex. 2004).

In this case, the issue of attorney’s fees was submitted to the trial court, rather than the jury, by agreement of the parties.  SPM’s lead counsel, Marshall Searcy, testified about SPM’s attorney’s fees.  SPM’s fee agreement with Searcy’s firm consisted of three elements.  First, SPM paid Searcy’s firm a flat fee of $150,000 up front.  Second, SPM agreed to pay Searcy’s firm 5% of SPM’s ultimate recovery, if any.  Third, SPM agreed that Searcy’s firm could keep any attorney’s fees awarded by the trial court.  SPM argues that this third provision contemplates a fee higher than the flat $150,000 plus 5%, contingent upon whether the trial court awarded attorney’s fees.

Searcy testified that the services his firm rendered to SPM had a lodestar value of $667,114.  He then testified that a reasonable fee would be $1.5 million.  To support a reasonable fee in excess of the lodestar value, Searcy testified at length about the rule 1.04 elements.  Most significantly, Searcy testified that the risk his firm took of losing the case and receiving nothing over its $150,000 base fee  justified the $1.5 million fee.  He also testified that the lodestar value would represent a reasonable fee if SPM had paid his firm on a monthly basis; but since his firm had to wait until the conclusion of the case to collect its fee, the lodestar value was insufficient.  Finally, Searcy testified that $1.5 million represented about 25% of the jury’s verdict—significantly less than the 30%-50% typically charged by Tarrant County attorneys in contingent fee cases.  

The trial court made findings of fact and conclusions of law that specifically took into account the rule 1.04 factors.  The trial court found that the following attorney’s fees were reasonable:  $1.5 million through the date of judgment, plus $200,000 if Toshiba is unsuccessful in this appeal, plus $35,000 if Toshiba files a petition for review with the Supreme Court of Texas and the petition is denied, or $65,000 if the Supreme Court grants the petition but rules against Toshiba on the merits.  The trial court incorporated these fees into its judgment. 

Toshiba lodges two complaints about SPM’s attorney’s fees.  First, Toshiba contends that SPM is not entitled to any award of attorney’s fees because SPM did not prevail on its breach of contract claim.  We have already concluded that SPM may recover for breach of contract; therefore, SPM may also recover its reasonable attorney’s fees.  
See
 
Tex. Civ. Prac. & Rem. Code Ann.
 § 38.001.

Second, Toshiba argues that the trial court erred by awarding more than the lodestar amount.  To support this argument, Toshiba cites 
Dague
, 505 U.S. at 557, 112 S. Ct. at 2638, and 
PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. P’ship
, 41 S.W.3d 270 (Tex. App.—Houston [14th Dist.] 2001, no pet.), 
rev’d on other grounds
, 146 S.W.3d 79 (Tex. 2004). 
 
The question in 
Dague
 was whether the attorney’s fees shifting provisions of the federal Solid Waste Disposal Act and Clean Water Act permitted “enhancement” of lodestar attorney’s fees where the attorney’s fees were contingent. 
 Dague
 at 559, 112 S. Ct. at 2639.  The Supreme Court held that such enhancement was not permitted under the statutes in question.  
Id.
 at 567, 112 S. Ct. at 2648.  Since this case involves neither of those statutes, 
Dague
 offers little guidance and imposes no restrictions here.  Moreover, Texas courts consistently allow the use of a multiplier based upon the contingent nature of a fee under Texas statutes allowing recovery of attorney's fees.  
Dillard Dept. Stores, Inc. v. Gonzales
, 72 S.W.3d 398, 413 (Tex. App.—El Paso 2002, pet. denied).

Nor is Toshiba’s argument supported by 
PPG Industries.  
In that DTPA case, the trial court awarded a “bonus” of $300,000 on top of the plaintiff’s lodestar attorney’s fee.  
PPG Indus.
 41 S.W.3d at 285.  The court of appeals held that the trial court had no authority to consider the result obtained as a basis for awarding the bonus against the defendant.  
Id.
  But the court went on to affirm the bonus because there was some evidence, besides the result obtained, to show that the attorney’s fee, including the bonus, was reasonable.  
Id.
  The court concluded that the trial court had not abused its discretion in awarding the bonus.  
Id.

In our case, as in 
PPG Industries
, there is some evidence that the trial court’s award of attorney’s fees to SPM is reasonable.  We hold that the trial court did not abuse its discretion by awarding those fees to SPM.  We overrule Toshiba’s eighth issue.

Did the trial court err by failing to submit Toshiba’s counterclaim to the jury? 

In its ninth and tenth issues, Toshiba argues that the trial court erred by failing to submit Toshiba’s counterclaim to the jury and failing to direct the verdict on the counterclaim.  Toshiba sued SPM for the unpaid balance of the BMC-800.  The amount of the unpaid balance, $658,800, was not disputed.

A buyer must pay at the contract rate for any goods accepted.  
Tex. Bus. & Com. Code Ann.
 § 2.607(a).  Toshiba argues that it was entitled to a directed verdict on its counterclaim because SPM accepted the BMC-800 as a matter of law.  But the jury failed to find that SPM accepted the BMC-800, and we have already concluded that Toshiba failed to prove acceptance as a matter of law.  Thus, Toshiba was not entitled to a directed verdict.

Nor did the trial court err by refusing to submit Toshiba’s counterclaim to the jury.  Since the amount of the counterclaim was undisputed, the only question for the jury to decide was whether SPM accepted the BMC-800.  If the jury had found that SPM accepted the machine and did not revoke its acceptance, Toshiba would be entitled to judgment for the amount of its counterclaim.  But because the jury failed to find that SPM accepted the BMC-800, SPM is not liable for the unpaid balance.

We overrule Toshiba’s ninth and tenth issues.

SPM’s non-contract claims

In its third and fifth issues, Toshiba argues that the trial court erred by submitting SPM’s breach of warranty, fraud, and negligent misrepresentation claims to the jury.  Because we affirm the judgment on SPM’s breach of contract claims, we need not consider these two issues.  
See
 
Tex. R. App. P.
 47.1.

SPM’s Issue:  When did prejudgment interest begin to accrue?

In its sole issue, SPM complains that the trial court chose the wrong date from which to calculate prejudgment interest.  The trial court chose February 29, 2000, the date SPM filed suit.  SPM contends that prejudgment interest began to accrue on May 3, 1999, 180 days after SPM sent Toshiba what SPM claims was notice of its claims.  The difference is significant; using the earlier date yields an additional $493,000 in prejudgment interest.

Prejudgment interest accrues on the amount of a judgment during a period that begins on the earlier of the 180th day after the date a defendant receives written notice of a claim against it, or the date the suit is filed.  
Tex. Fin. Code Ann
. § 304.104 (Vernon Supp. 2004-05).  Although section 304.101 states that “[t]his subchapter applies only to a wrongful death, personal injury, or property damage case,” the Supreme Court of Texas has extended the notice provision of section 304.104 to all claims.  
Id. 
§ 304.101;
 Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.
, 962 S.W.2d 507, 531 (Tex. 1998).

A “claim” under section 304.104 is a demand for compensation or an assertion of a right to be paid.  
MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.
, 98 S.W.3d 766, 773 (Tex. App.—Fort Worth 2003, pet. denied).  A claim need not demand an exact amount or list every element of damage.  
Bevers v. Soules
, 909 S.W.2d 599, 603 (Tex. App.—Fort Worth 1995, no writ).

Standard of review

Before we turn to the merits of SPM’s issue, we must determine what standard of review to apply.  In 
MCN Energy Enterprises
, we wrote that “[t]he date from which statutory prejudgment interest should begin is a question of law that an appellate court must review de novo.”  98 S.W.3d at 773
.
  We cited as authority for that proposition 
Johnson v. City of Fort Worth
, 774 S.W.2d 653, 655-56 (Tex. 1989).  
Johnson
 did not concern prejudgment interest; instead, it stands for the general proposition that “matters of statutory construction are questions of law for the court to decide rather than issues of fact.”  
Id.
 at 656.  Implicit in 
Johnson, 
and necessary to bridge the gap between 
Johnson
 and 
MCN Energy Enterprises
, is the rule that appellate courts review questions of law de novo.  
See
, 
e.g.,
 
Graves v. Alders
, 
132 S.W.3d 12, 17 (Tex. App.—Beaumont 2004, pet. denied).

On the other hand, we held that “[a] trial court's award of prejudgment interest is reviewed under an abuse of discretion standard” in 
Manufacturers Auto Leasing, Inc. v. Autoflex Leasing, Inc., 
139 S.W.3d 342, 348 (Tex. App.—Fort Worth 2004, pet. denied).  Our sister courts generally hold the same.
(footnote: 4)
 The San Antonio Court of Appeals described the standard of review this way:

We review a trial court's award of prejudgment interest under the abuse of discretion standard. [Citation omitted.]  Under this standard, we will not disturb a trial court’s findings on factual issues unless the court reasonably could have reached only one decision and it failed to do so.  
Walker v. Packer
, 827 S.W.2d 833, 839-40 (Tex. 1992).  However, “a trial court has no discretion in determining what the law is or applying the law to the facts.”  
Id.
 at 840.

J.C. Penney Life Ins. Co. v. Heinrich
, 32 S.W.3d 280, 289 (Tex. App.—San Antonio 2000, pet. denied).  We conclude that 
Heinrich
 correctly articulates the general standard for reviewing an award of prejudgment interest.  The abuse of discretion standard applies to the trial court’s factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court’s application of the law to the facts.

In the case before us, the trial court’s award of prejudgment interest does not hinge on any factual finding.  Instead, the issue turns on the interpretation of a single letter from SPM to Toshiba.  The existence and contents of the letter are not in dispute. The question is whether the letter constituted notice of SPM’s claims as a matter of law.  Therefore, as a practical matter, our review of the prejudgment interest issue in this case is de novo.

Facts and analysis

On November 4, 1998, SPM sent a letter to the president of Toshiba Machine Co., Ltd. in Japan.
(footnote: 5)  SPM complained that the BMC machines 

will not perform to the specifications in the machine literature or as represented by Toshiba . . . . [W]e are concerned that the machines will never perform consistently to Toshiba’s specifications and SPM’s contract requirements.

The letter summarized twenty-one complaints about the BMC machines and Toshiba’s earlier responses to those complaints.  SPM stated that it had incurred damages of $998,250 and continued to incur damages at the rate of $5,775 for each day the machines did not perform.  SPM concluded its letter with these words:

SPM is prepared to litigate the issues if necessary.  However, SPM prefers to resolve the issues if the machines can perform to specification and contract requirements.  If this is not attainable, SPM prefers to return the machines to Toshiba, with Toshiba to absorb SPM’s costs-to-date.

SPM contends that this letter was sufficient notice of its claims to trigger accrual of prejudgment interest 180 days later.  Toshiba responds that the letter did not give notice of a claim because it did not make a demand for payment or assert a right to be paid.

We look to similar cases for guidance.  In 
Bevers
, we held that a signed medical authorization form, coupled with a letter asking an insurance company to “properly consider [plaintiff’s] injury claim,” constituted notice.  
Bevers, 
909 S.W.2d at 603.  The Texarkana court 
reached the same conclusion where a personal injury plaintiff, at the defendant’s request, signed a medical records release form that stated, “[t]his information is to be used for purposes of evaluating and handling my claim for injury.”  
K Mart Corp. v. Rhyne
, 932 S.W.2d 140, 146 (Tex. App.—Texarkana 1996, no writ).  Likewise, the Austin court held that a request from a plaintiff to a defendant’s insurance company asking the company to pay certain medical bills, and inquiring when he would receive his next lost wages check, was a “claim” for purposes of prejudgment interest.  
Robinson v. Brice
, 894 S.W.2d 525, 529 (Tex. App.—Austin 1995, writ denied).  More recently, the Beaumont court concluded that letters requesting reimbursement for medical treatment constituted written notice of a claim.  
Brookshire Grocery Co.
, 99 S.W.3d at 825.

There is a key distinction between those cases and the case now before us.  In each of those cases, the claims asserted by the writings in question were certain and unconditional.  The writings did not urge the recipients to avoid a contingent, future liability, but to accept an accrued, existing liability.  SPM’s letter does just the opposite.  SPM urges Toshiba to avoid a future claim by curing the defects in the BMC machines.  SPM does not demand payment or assert a right to be paid.  Instead, SPM suggests that it will assert a claim and demand payment in the future if Toshiba cannot make its machines perform to specification.

We hold that SPM’s November 4, 1998 letter did not constitute notice of a claim as a matter of law.  The trial court properly computed prejudgment interest from the date SPM filed suit.  We overrule SPM’s sole issue.

Conclusion

We overrule Toshiba’s issues two, four, and six through eleven.  We do not reach Toshiba’s issues one, three, and five.  We overrule SPM’s sole issue.  We therefore affirm the trial court’s judgment in all respects.  
See 
Tex
. R. App. P.
 43.2(a).

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J.; GARDNER and MCCOY, JJ.

DELIVERED:  November 10, 2005

FOOTNOTES
1:
Toshiba sued SPM in Illinois for the unpaid balance due on the BMC-800  in November 1999.  The Illinois trial court dismissed that suit for lack of jurisdiction.

2:
Section 1.103 of the Texas Business and Commerce Code states that the Code should be liberally construed “to make uniform the law among various jurisdictions.”  
Tex. Bus. & Com. Code Ann.
 § 1.103(a)(3) (Vernon 1994).  Section 311.028 of the Texas Government Code provides that “[a] uniform act . . . shall be construed . . . to make uniform the law of those states that enact it.”  
Tex. Gov’t Code Ann.
 
§ 
311.028 (Vernon 2005).  Thus, in determining and applying the Texas version of the Uniform Commercial Code, we may consider and apply pertinent decisions from other jurisdictions.  
Rogers v. Ricane Enterprises, Inc
.  930 S.W.2d 157, 171 (Tex. App.—Amarillo1996, writ denied); 
Fin. Universal Corp. v. Mercantile Nat'l Bank
, 683 S.W.2d 815, 817 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).

3:
Toshiba’s “Issues Presented” lists two issues numbered “7.”  We will refer to the first as “7a” and the second, discussed elsewhere in this opinion, as “7b.”

4:
See, e.g., Protective Life Ins. Co. v. Russell
, 119 S.W.3d 274, 288 (Tex. App.—Tyler 2003, pet. denied); 
Brookshire Grocery Co. v. Smith
, 99 S.W.3d 819, 823 (Tex. App.—Beaumont 2003, pet. denied);
 Wilmer-Hutchins ISD v. Smiley
, 97 S.W.3d 702, 706 (Tex. App.—Dallas 2003, pet. denied);
 Purcell Constn., Inc. v. Welch
, 17 S.W.3d 398, 402 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (“We review a challenge to a trial court's award of pre-judgment interest using an abuse of discretion standard, giving limited deference to the court's application of the law to the facts.”); 
Marsh v. Marsh
, 949 S.W.2d 734, 744 (Tex. App.—Houston [14th Dist.] 1997, no writ)
.

5:
Toshiba points out that the letter is not addressed to Toshiba Machine Co., America, but to its parent company, Toshiba Machine Co., Ltd.  But Toshiba does not complain that it did not receive the letter, so the letter’s addressee is not a factor in our analysis.