Bernice **HUDSPETH**, Appellant,

v.

**ENTERPRISE LIFE INSURANCE COMPANY**, Appellee.

No. 01–10–00672–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 1, 2011.

Craig A. Welscher, The Welscher Law Firm, Houston, TX, for Appellant.

Bradley E. McLain, Katherine L. Killingsworth, Oliver B. Krejs, Settlepou, Dallas, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices BLAND and HUDDLE.

## OPINION

SHERRY RADACK, Chief Justice.

This case involves a dispute over a credit disability insurance policy underwritten by defendant/appellee Enterprise Life Insurance Company that plaintiff/appellant Bernice Hudspeth purchased when she bought a new car from defendant Sterling McCall Chevrolet–Toyota, Inc. The vehicle and insurance were financed through defendant Toyota Motor Credit Corporation.

We reverse and remand in part and affirm in part.

## BACKGROUND

On July 5, 2003, Hudspeth purchased a 2003 Toyota Camry from Sterling McCall Toyota. In conjunction with that purchase, she also bought a disability insurance policy for $1,254.87 to cover her car payments in the event of her disability. The total insurance amount was $33,022.00 (the total amount of the monthly payments under the installment contract) with an effective date of July 5, 2003, and a scheduled termination date of July 19, 2008. It was a "reducing" policy, meaning that the value of the insurance declined when each car payment was made reducing the balance owed on the vehicle.

### A. Contract Provisions

The back of the credit insurance contract contains the following provision defining disability in a section entitled "DISABILITY INSURANCE COVERAGE":

> *TOTAL DISABILITY:* means Disability resulting from sickness or injury and which begins while the coverage is in force and causes the insured to be unable to perform the usual and customary duties of the Insured's current occupation at the time disability occurs. The definition changes after twelve (12) consecutive months of Total Disability and requires that the insured be unable to perform the duties of any occupation for which the insured is reasonably qualified by education, training or experience. The Company will not pay disability benefits on the Insured's behalf unless a doctor of medicine or osteopathy who is licensed by the State Board of Medical Examiners certifies the Insured's Total Disability to the Company. *The insured will be required to give the Company written proof of continuing Total Disability at monthly intervals in order to justify the continuing payment of benefits.* (emphasis added)

The following provisions related to specific claim procedures are included in a section entitled "RULES FOR FILING A DISABILITY CLAIM":

> *NOTICE OF CLAIM:* Written notice of the Insured's claim must be furnished

within 20 days after the loss occurs or as soon as reasonably possible.

*CLAIM FORMS:* The Company will furnish a claim form for filing proof of loss within 15 days, upon request. If a claim form is not received within 15 days, the claimant may submit written proof of disability signed by a licensed physician including the date and cause of the total disability to the Company.

*PROOF OF LOSS:* Written proof of loss must be furnished to the Company within 90 days. *Any subsequent written proof of the continuation of the disability must be furnished to the insurer at such intervals as the insurer may reasonably require. Failure to furnish such proof within the time required shall not [illegible] nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.* (emphasis added)

The following provision setting forth the conditions under which coverage will terminate is located in a section entitled "GENERAL PROVISIONS":

*WHEN INSURANCE STOPS:* All insurance under this certificate shall terminate on the earliest of the following dates: (a) on the scheduled expiration date; (b) on the date the debt is prepaid, renewed, amended, or refinanced; (c) the debt is transferred to another debtor; (d) the collateral is repossessed; (e) a judgment is filed against you with respect to the debt; (f) we receive a written request from you to cancel the coverage; or (g) upon payment of death benefits. Termination due to these events shall be without prejudice to any claim incurred prior to the termination. If the loan is paid off prior to the expira-

tion date and the Debtor is still totally disabled and under the continuous care of a licensed physician, benefits will continue and be paid to the debtor until the debtor is released to return to work or to the expiration date of coverage, whichever comes first. Upon termination of a continuing claim within the originally scheduled term of insurance, a refund shall be made of any then unearned premium.

### B. Hudspeth's Disability Claim

In September 2005, Hudspeth was diagnosed with cancer in her stomach, colon, and throat. At that time, she worked in the human resources department at Advance Controls, and had health insurance through her employer. Following surgery for her cancer, she was unable to return to work, lost her health insurance, and was referred to Ben Taub hospital for county-provided care.

Hudspeth first called Enterprise to put them on notice of her disability in September 2005, the day after her surgery. Enterprise did not send her a claim form in response to that call, but did send her one in November after she made a follow-up call.

In November 2005, she submitted her claim form, along with documentation from her physician and employer as requested by Enterprise. In response, she received a December 6, 2005 letter from Enterprise indicating that her benefits had been approved and explaining that she would need to file a completed continuing claim form each month. The letter further explained that future benefits would not be processed without the monthly claim form and admonished that if the claim form was not fully completed, processing of future benefits might be delayed. On the same day, Enterprise forwarded an initial $935.65 benefits check to Toyota to cover the peri-

od from October 11, 2005 through November 30, 2005.

In December 2005, Hudspeth sent Enterprise an incomplete continuing claim form and called to explain that she did not have a doctor and was unable to get the medical verification part of the form completed. Her inability to get a doctor's certification in that timeframe was related to her transfer from private health care to the county-provided services. While she started the process of trying to be seen by a county physician immediately after her discharge from the hospital in September 2005, she was unable to secure an appointment until February with a county primary care physician.[1]

The county doctor who Hudspeth saw for the first time in February would not sign the continuing disability form because she was unfamiliar with Hudspeth as a patient. She first wanted to run diagnostic tests on Hudspeth to understand her condition, evaluate the stage of her cancer, and assign her to an oncologist. Hudspeth was required to do more county paperwork, and was unable to get the tests the doctor ordered performed until March 2006. In April 2006, she saw an oncologist for the first time, and he signed her continuing disability form on April 11, 2006.

In January and February 2006, Hudspeth kept Enterprise informed by phone about the status of her attempts to get the continuing disability form signed. On February 27, 2006, Enterprise sent her a letter reminding her that her monthly continuation claim form had not been submitted and stating that "If we do not hear from you within 15 days, we will assume you do not wish to pursue further disability benefits and your claim file will be closed." In response, Hudspeth called Enterprise to let them know that she would not be able to see a doctor until April 2006. In a letter dated March 30, 2006, Enterprise informed Hudspeth that it had not received a continuing claim form for more than 50 days and that her claim file was closed. It also stated, "Should you have any additional information that would cause us to reconsider our position, please send it to the address below." A blank continuing-claim form was enclosed with the letter. Pursuant to instructions received during her last phone call with Enterprise, once Hudspeth got the form signed in April, she faxed a copy to Enterprise and mailed the original.

After Hudspeth submitted this April claim form and documentation, she did not hear from Enterprise until she received a letter dated June 7, 2006 stating that Enterprise had "reviewed [her] claim for insurance benefits," but that her claim was denied because "[c]overage was cancelled prior to the date of loss." She immediately called Enterprise, and someone told her that her case would have to be discussed at an upcoming meeting where a decision would be made and that someone would get back to her. Hudspeth was never contacted by Enterprise, but she continued calling them through September 2006 to try to get resolution. She also called Toyota for help. Enterprise never made a payment under Hudspeth's policy after the initial one in December 2005. Eventually, Toyota Motor Credit repossessed Hudspeth's vehicle in April 2007 for nonpayment of the note.

Hudspeth testified that, between November 2005 and April 2006, she corresponded with Enterprise at least twice a month to keep it apprised of her situation,

---

1. Hudspeth first had to go through the process of being approved for financial assistance from the county. She received that approval in late January of 2006 and only then was she permitted to request an appointment with a doctor.

and Enterprise never indicated to her that her policy would be cancelled. She was instead told to get the paperwork in as soon as possible.

## C. The Lawsuit, Pre–Trial Summary Judgments, and Settlements

Hudspeth sued Enterprise, Toyota Motor Credit Corporation, and Sterling McCall Toyota (collectively, defendants) on March 8, 2008 for (1) breach of contract, (2) negligence, (3) DTPA Violations, (4) breach of duty of good faith and fair dealing, and (5) wrongful repossession under UCC § 9.625(C)(2). For her breach of contract, negligence, breach of good faith, and DTPA claims, she pleaded actual damages of $35,022.80. For her wrongful repossession claim, she pleaded actual damages "in a minimum amount of" $11,245.13. She also sought unspecified attorney's fees, as well as mental anguish damages, treble DTPA damages, and exemplary damages. Toyota Motor Credit filed a breach-of-contract counterclaim against Hudspeth to recover the $9,100.08 deficiency on her note and filed a cross-claim against Enterprise for a breach of Chapter 541 of the Texas Insurance Code.

Enterprise moved for traditional summary judgment on Hudspeth's claims, arguing that (1) it was entitled to judgment as a matter of law on the merits of each claim, and (2) that each of the claims (except breach of contract) was barred by the two-year statute of limitations. Without specifying the grounds, the trial court granted a partial summary judgment on all Hudspeth's claims against Enterprise except breach of contract.

Enterprise then moved for a partial summary judgment, arguing that because Hudspeth had made almost half the payments on her vehicle—thereby reducing the balance owed to $17,410.35—any recovery against Enterprise for breach of contract should be limited to that $17,410.35 balance rather than the full value of the repossessed car. The court granted that motion as well.

Hudspeth settled with Toyota Motor Credit without payment of money but with the agreement that each would dismiss specific claims. The settlement agreement stated specifically that it was to settle (1) all the claims by Hudspeth against Toyota Motor Credit, specifically including, "among other things, Breach of Contract and Wrongful Repossession," and (2) Toyota Motor Credit's "counter-claim for Breach of Contract" against Hudspeth and its "cross claim against Enterprise Life Insurance Company for breach of Chapter 541 of the Texas Insurance Code."

Hudspeth also settled with Sterling McCall Toyota for $6,500.00. The settlement agreement specifies that this payment to Hudspeth is in exchange for a release

> from any and all claims, demands and causes of action of whatsoever nature, whether in contract, in tort or arising from a statute ... resulting from, arising out of, or in any way related to losses or damages of any kind to personal or real property stemming from, arising out of or related to the purchase of credit disability insurance from ... Sterling McCall Toyota, on or about July 2003, in connection with the purchase of a 2003 Toyota Camry from Sterling McCall Toyota and all damages arising out or related to the purchase, and denial or claims made by Hudspeth, and/or the repossession of the 2003 Toyota Camry, all as more specifically set forth on the pleading on file herein.

Enterprise then moved for summary judgment again, alleging that because Hudspeth had recovered for her injury from Toyota Motor Credit and Sterling McCall Toyota, the one satisfaction rule

should preclude any recovery from Enterprise. Alternatively, Enterprise argued that it was entitled to an offset of the value of Hudspeth's settlements with Toyota Motor Credit and Sterling McCall Toyota. Because the court had already ruled that Enterprise's liability was capped at $17,410.35, Enterprise asserted, the value of the $9,100.08 deficiency non-suit and the $6,500.00 settlement should be applied to that amount as settlement credits to reduce Enterprise's total potential liability to $1,810.27. The trial court granted this motion, stating that Enterprise was entitled to an offset under the one satisfaction rule, and that "recovery, if any on [Hudspeth's] breach of contract claim against defendant Enterprise is limited to $1,810.27."

### D. The Trial, Verdict, and Judgment

Hudspeth testified at trial that she was damaged by Enterprise's actions through the loss of her vehicle. She testified that she was familiar with the fair market value of her car and that, at the time it was repossessed, it was worth "[a]bout $33,000 and some change."

Hudspeth's attorney testified as to his attorney's fees of $37,279.00 and to his opinion that reasonable appellate attorney's fees would be $30,000.00 in the court of appeals and $21,000.00 in the supreme court. Enterprise's attorney provided rebuttal testimony on attorney's fees.

The jury found that Enterprise breached the insurance contract, failed to find that Hudspeth breached the insurance contract, and awarded $33,000.00 to Hudspeth in damages. The jury awarded $35,000.00 in trial attorney's fees, and an additional $45,000.00 for an appeal to the court of appeals and $56,000.00 for an appeal to the supreme court. The trial court suggested a remittitur of appellate attorney's fees, which Hudspeth accepted. The trial court

entered judgment awarding (1) $1,810.27 in actual damages (after applying its earlier rulings capping Enterprise's liability and applying offsets), (2) 6% prejudgment interest (applied to $1,810.27 commencing April 1, 2008, over Hudspeth's objection that it should be applied to $17,410.35 beginning April 11, 2006), (3) trial attorney's fees of $35,000.00, and conditional appellate fees of $30,000.00 for an appeal to the court of appeals and $21,000.00 for an appeal to the supreme court, and (4) court costs and postjudgment interest.

### ISSUES ON APPEAL

Hudspeth appealed the trial court's judgment, bringing the following six issues:

1. Whether the Trial Court erred by limiting Mrs. Husdpeth's damages to the $17,410.35 remaining on the contract.

2. Whether the Trial Court erred in granting offsets for a pure breach of contract claim when Enterprise did not prove a risk of double recovery by showing the settlement funds were for common damages.

3. Whether the Trial Court erred in using the filing date of Plaintiff's Original Petition to determine interest, resulting in Mrs. Hudspeth not recovering $3,495.31 in principal that was due.

4. Whether the Trial Court erred in not determining the appropriate date for the beginning of the running of the statute of limitations in all claims as June 7, 2006.

5. Whether the Trial Court erred in granting summary judgment denying Mrs. Hudspeth's DTPA claim.

6. Whether the Trial Court erred in granting summary judgment deny-

ing Mrs. Hudspeth's good faith and fair dealing claim.

7. Whether the Trial Court erred in granting summary judgment denying Mrs. Hudspeth's negligence claim.

## LIMITATION OF CONTRACT DAMAGES

The insurance policy that Hudspeth purchased from Enterprise is "reducing" in nature. The policy states:

If this insurance is in effect, the Original Amount of Insurance shown in the Schedule is the amount of insurance in force during the first month of coverage. After the first month, it declines each month by an equal amount. The declining amount is the Original Amount of insurance divided by the number of months in the Term of Coverage. This coverage will be referenced as 'Reducing' herein.

The original amount of insurance was $33,022.00, with a 60–month term and monthly payments of $550.30. According to Enterprise's summary judgment evidence, after all Hudspeth's payments were credited—and the insurance amount was correspondingly reduced—the amount of insurance remaining was $17,410.35. The trial court granted summary judgment that Enterprise's liability was limited to this $17,410.35 amount.

In her first issue, Hudspeth complains that the trial court erred by limiting Enterprise's liability to $17,410.35. She points to trial testimony that the fair market value of the car was $33,000.00, and that the jury found that sum of money would fairly compensate her for Enterprise's failure to comply with the policy. She argues that such amount is "not so divergent from the evidence as to clearly be wrong or unjust therefore it must be upheld."

In response, Enterprise argues that the summary judgment was proper because the amount an insured may recover for a breach of insurance contract is defined by the terms of that contract. *See Gross v. Connecticut Gen. Life Ins. Co.*, 390 S.W.2d 388, 390 (Tex.Civ.App.-El Paso 1965, no writ). Because the value of the insurance contract at the time of the breach and repudiation was $17,410.35, Enterprise asserts that was the maximum Hudspeth could recover.

### A. Applicable Law

We review a summary judgment de novo. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). The party moving for a traditional summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Haase v. Glazner*, 62 S.W.3d 795, 797 (Tex.2001).

▮ Insurance policies are interpreted according to the rules of contract construction. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). In applying these rules, our primary concern is to ascertain the parties' intent as expressed in the language of the policy. *See id.* at 464. In determining the intention of the parties, we look only within the four corners of the insurance agreement to see what is actually stated, not what was allegedly meant. *See Esquivel v. Murray Guard, Inc.*, 992 S.W.2d 536, 544 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). If the policy language is worded so that it can be given a definite or

certain legal meaning, it is not ambiguous, and we construe it as a matter of law. *Kelley–Coppedge*, 980 S.W.2d at 464.

The general measure of damages for breach of a disability insurance contract by repudiation "is the total of accrued payments plus interest, plus the present value of all unaccrued payments that the plaintiff would have received if the contract had been performed." *Republic Bankers Life Ins. Co. v. Jaeger*, 551 S.W.2d 30, 31 (Tex.1976); *Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex.Civ.App.-Dallas 1981, no writ) ("In Texas, where a party . . . obligated by contract to make monthly payments of money to another absolutely repudiates the obligation without just excuse, the obligee is entitled to maintain his action in damages at once for the entire breach, and is entitled in one suit to receive in damages the present value of all that he would have received if the contract had been performed.")

## B. Analysis

Hudspeth does not dispute the reducing nature of the disability policy; nor does she take issue with Enterprise's evidence that at the time it breached the contract, the value of the remaining insurance under the contract was $17,410.35. Instead, she argues that she is entitled to recover the full value of her vehicle that was repossessed as consequential damages as found by the jury. She cites no authority in support of this argument. We conclude that the trial court did not err in holding that, under the terms of the policy and Texas law, Hudspeth's damages for Enterprise's breach of the disability policy by failure to make disability payments could not exceed the value of the wrongfully withheld payments. The trial court did not err in granting summary judgment in this regard.

We overrule Hudspeth's first issue.

## SETTLEMENT OFFSETS

The trial court further reduced Enterprise's liability by offsetting the value of settlements Hudspeth reached with Toyota Motor Credit and Sterling McCall Toyota against Enterprise's $17,410.35 maximum liability amount. The trial court valued Hudspeth's settlement with Toyota Motor Credit—under which neither paid any money to the other—at $9,100.08, the amount Toyota sought in its counterclaim against Hudspeth that it agreed to dismiss pursuant to the settlement.[2] The settlement agreement with Sterling McCall Toyota was valued at $6,500.00 because it provided for a payment to Hudspeth in that amount. The trial court applied these offset amounts to the $17,410.35 amount to cap Enterprise's liability at $1,810.27.

In her second issue, Hudspeth argues that the trial court erred by applying the offsets to Enterprise's maximum liability amount for breach of contract under the one satisfaction rule. While her recovery in the final judgment against Enterprise was limited to breach of the insurance contract, she argues that her settlements with the other defendants were for breach of the automobile purchase contract, DTPA claims, negligence, and wrongful repossession of her vehicle. For this reason, she argues, the one satisfaction rule does not support the offset of settlement credits in this case. Alternatively, she urges that "[i]f the One Satisfaction Rule applied, it should only apply to prevent a windfall, not prevent full compensation and allow a

2. Hudspeth disputed this method of valuing the settlement in the trial court, but does not specifically complain about that here, so we do not address whether this method was proper.

defendant to escape liability." In other words, the offset should apply to the full amount of her injury caused by defendant's conduct, i.e., $33,000.00.

In response, Enterprise asserts that the trial court "properly granted an offset in this case in order to prevent double recovery." It argues that even though Hudspeth asserted different claims against the defendants, "[w]hether the one satisfaction rule applies is determined not by the type of cause of action, but by the injury." Because Hudspeth "raised her breach of contract claim against *all* Defendants" and because she alleged that the Defendants "acted in concert" and sought relief "jointly and severally," Enterprise argues that all of her allegations as to wrongdoing "result in a single injury," making application of the one satisfaction rule appropriate.

### A. Applicable Law

▮▮ The one satisfaction rule applies when multiple defendants commit the same act, or when multiple defendants commit "technically different acts" that result in the same, single injury. *AMX Enters., Inc. v. Bank One, N.A.*, 196 S.W.3d 202, 206 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (citing *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000)). Under the rule, a plaintiff who has suffered only one injury, even if based on overlapping and varied theories of liability, may only recover once, particularly if the evidence supporting each cause of action is the same. *Buccaneer Homes of Alabama, Inc. v. Pelis*, 43 S.W.3d 586, 590 (Tex.App.-Houston [1st Dist.] 2001, no pet.). "[T]he absence of tort liability does not preclude the application of the one satisfaction rule." *AMX Enters.*, 196 S.W.3d at 206.

### B. Analysis

▮ The purpose behind the one satisfaction rule is not to reduce a defendant's liability, but instead to prevent "a plaintiff from recovering twice for a single injury." *Id.* at 206. Hudspeth's petition asserts various contract and tort claims against defendants, but consistently complains and seeks damages for the same ultimate injury—repossession of her vehicle. For this reason, we agree with Enterprise that the one satisfaction rule applies, regardless of the nature of Hudspeth's claims, to prevent her receiving a windfall recovery for more than the amount of her injury from multiple defendants.

▮ It does not follow, however, that it was proper for the trial court to offset the settlement amounts against the $17,410.35 amount it determined was Enterprise's maximum liability under the insurance contract. Hudspeth alleged that Enterprise played a part in her losing her vehicle by refusing to honor an insurance policy that she purchased for the express purpose of covering her car payments to prevent repossession of that vehicle in the event of her disability. The terms of that insurance contract prevent Hudspeth from recovering the full value of the repossessed vehicle from Enterprise, but that does not prohibit her from recovering collectively from the defendants the full amount of her injury so long as her recovery against Enterprise does not exceed its maximum liability under the contract. While the ultimate injury alleged was the same, Hudspeth pleaded conduct by, and claims against, the other two defendants that were wholly distinct from Enterprise's breach of the insurance contract. Hudspeth's claims against the other defendants are not subject to the contractual provisions limiting Enterprise's liability. In addition, the settlement agreements identify and release claims and conduct unrelated to Enterprise's insurance policy as the subject and consideration of the

settlement, including wrongful repossession. The purpose of the one satisfaction rule is to prevent a windfall to the plaintiff, not to deprive the plaintiff of full recovery for his or her injury from multiple defendants simply because a contract limits the liability of one of the defendants. *See, e.g., First Title Co. of Waco v. Garrett,* 860 S.W.2d 74, 78 (Tex.1993) ("The rationale for this doctrine is that the plaintiff should not receive a windfall by recovering an amount in court that covers the plaintiff's entire damages, but to which a settling defendant has already partially contributed."); *Smith v. Cudd Pressure Control, Inc.,* 126 S.W.3d 106, 110 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) ("[T]he 'One Satisfaction Rule' ... was designed to prevent a windfall to plaintiffs, and dictates that when a plaintiff files a suit against multiple defendants for a single injury, any settlements will be credited against the amount for which non-settling defendants are found liable.")[3]

The trial court erred by reducing Enterprise's contractual liability by the settlement amounts to further reduce Enterprise's liability to $1,810.27. The jury valued Hudspeth's total injury at $33,000.00, and returned a verdict against Enterprise for that amount. That is the amount against which the trial court should have offset settlements to determine if Enterprise's maximum liability of $17,410.35 should be further reduced. Applying the offsets—which total $15,600.08—against the $33,000 leaves Hudspeth's maximum remaining recovery at $17,399.92. This is $10.43 less than Enterprise's maximum liability under the policy. Accordingly, Enterprise's liability should have been reduced by $10.43, resulting in a judgment for actual damages of $17,399.92.

We sustain Hudspeth's second issue.

## PREJUDGMENT INTEREST CALCULATION

The trial court's judgment awarded $216.05 to Hudspeth in prejudgment interest. The court arrived at this amount by applying a 6% prejudgment interest rate to the $1,810.27 judgment amount against Enterprise. Under its calculation, interest began running on April 1, 2008, the date Hudspeth filed her original petition.

In her third issue, Hudspeth argues that the trial court did not properly calculate prejudgment interest. Specifically, she asserts that the prejudgment interest should have commenced on October 7, 2006 (which is 180 days after her April 7, 2006 correspondence enclosing her completed claims forms), rather than the date she first filed suit. In addition, she argues that the trial court erred by failing to apply a declining-principal formula to the damages, offsets and interest so that she would get the "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment."

---

**3.** While the proportionate responsibility and settlement credit provisions in Chapter 33 of the Texas Civil Practice and Remedies Code are not applicable in this case because they only apply to tort actions, we find the interaction between those provisions analogous, and the supreme court's application of them instructive. Section 33.013 generally limits a *defendant's liability* to no more than the percentage of damages that the jury finds that defendant is responsible for. TEX. CIV. PRAC. & REM.CODE § 33.013 (West 2008). Section 33.012 generally places a ceiling on the *plaintiff's maximum recovery,* and requires the plaintiffs' total recovery be reduced by any settlement amounts. *Id.* § 33.012. The supreme court has explained that, "although related, the two sections pose separate inquiries." *Roberts v. Williamson,* 111 S.W.3d 113, 123 (Tex.2003).

In response, Enterprise contends that the trial court "correctly identified April 1, 2008 as the date to determine pre-trial interest." It disputes that the April 11, 2006 correspondence enclosing claim forms is the type of written claim envisioned under Texas law allowing the commencement of prejudgment interest 180 days after a defendant receives a written claim. Enterprise does not respond to Hudspeth's argument that the trial court should have applied the declining-principal formula in calculating prejudgment interest.

## A. Applicable Law

■ For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998). A claim "is a demand for compensation or assertion of a right to be paid." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 785 (Tex. App.-Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). A claim need not demand an exact amount or list every element of damage. *Id.*

"The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts." *Figueroa v. Davis*, 318 S.W.3d 53, 66 (Tex. App.-Houston [1st Dist.] 2010, no pet.).

■ When settlement credits are at issue, the declining-principal formula should be used, under which settlements are credited when paid to reduce prejudgment interest. *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 816 (Tex. 2006); *see also Battaglia v. Alexander*, 177 S.W.3d 893, 904–12 (Tex.2005).

## B. Analysis

■ We agree with Hudspeth that prejudgment interest should have been calculated beginning six months after Enterprise received the April 7, 2006 written notice of her claim. "The prejudgment interest statute does not set forth requirements for what constitutes adequate 'written notice of a claim'" sufficient to trigger the 180–day period before prejudgment interest begins accruing. *Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex.App.-Austin 1995, writ denied). Texas courts have held, however, that a written notice that an injured party is seeking specific compensation for a specific injury is enough. *Id.* (holding trial court erred in calculating prejudgment interest from date lawsuit filed rather than date that insurer received letter from insured requesting certain attached medical bills be reimbursed and lost wages be paid); *see also Brookshire Grocery Co. v. Smith*, 99 S.W.3d 819, 824–25 (Tex.App.-Beaumont 2003, pet. denied) (rejecting argument that trial court abused its discretion in concluding the 180–day prejudgment interest period was triggered by correspondence asking for reimbursement of medical treatment expenses and explaining procedures suggested by doctors).

■ Hudspeth is also correct that the declining-principal formula should be used in calculating prejudgment interest when settlements credits are applied. *Brainard*, 216 S.W.3d at 816. We will not hold, however, that it was error for the trial court not to apply the declining-principal formula because—unlike her argument that her April claim triggered the 180–day period for prejudgment interest—it does not appear from the record that she ever brought this argument about declining-principal to the trial court's attention. TEX.R.APP. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g)

(holding that it is error for court of appeals to reverse trial court's ruling that had not been objected to at the trial court level); *Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702, 705 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (holding that issues not fairly presented to the trial court are waived). Because the trial court must revisit prejudgment interest on remand in light of our holding that settlement credits were not correctly applied and that prejudgment interest should have run from 180 days after Enterprise received Hudspeth's April 7, 2006 claim, Hudspeth may raise this declining-principal issue with the trial court on remand.

We sustain Hudspeth's third issue to the extent she argues that the 180-day period before prejudgment interest begins to accrue was triggered by Enterprise's receipt of Hudspeth's April 7, 2006 notice.

### EXTRA-CONTRACTUAL CLAIMS

Enterprise moved for summary judgment on both limitations and the merits of all Hudspeth's claims. The trial court granted summary judgment in Enterprise's favor on all Hudspeth's claims except breach of contract. The parties agree that her DTPA, breach of good faith and fair dealing, and negligence claims are all governed by a two-year statute of limitations and that Hudspeth sued Enterprise on March 8, 2006. They disagree, however, about when these claims accrued. Because the trial court did not specify upon which grounds it granted summary judgment, Hudspeth must demonstrate on appeal both that her claims were not limitations barred and that summary judgment was inappropriate on the merits.

#### A. Standard of Review

We review a traditional motion for summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). A defendant moving for traditional summary judgment must either (1) disprove at least one essential element of the plaintiff's cause of action as a matter of law, or (2) plead and conclusively establish each essential element of an affirmative defense. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 476–77 (Tex.1995). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact, thereby precluding summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). When the trial court's order granting summary judgment does not specify the grounds upon which it was granted, we will affirm the judgment if any of the theories advanced are meritorious. *See Knott*, 128 S.W.3d at 216.

#### B. Statute of Limitations

In her fourth issue, Hudspeth argues that her claims accrued on June 7, 2006, the date of Enterprise's letter responding to her completed April claim form. According to Hudspeth, the date she received this letter—which expressly denied coverage and indicated that Hudspeth's policy had previously been cancelled—was the first time she was on notice that she had a claim against Enterprise. Thus, according to Hudspeth, limitations did not run until June 7, 2008, rendering her March 8, 2008 petition timely.

In response, Enterprise argues that limitations ran on all Hudspeth's extra-contractual claims on July 5, 2005. It reasons that "any alleged misconduct" could only have occurred on July 5, 2005, the day Hudspeth executed the purchase and insurance contracts.

### 1. Applicable Law

The statute of limitations for a DTPA claim is two years. TEX. BUS. & COM.CODE ANN. § 17.565 (West 2011). A DTPA claim accrues when (1) the false, misleading, or deceptive act or practice occurred, or (2) the consumer discovered or in the exercise of reasonable diligence should have discovered the false, misleading, or deceptive act or practice. *Id.*

■■ Negligence and breach of good faith and fair dealing claims are also governed by a two-year limitations period. TEX. CIV. PRAC. & REM.CODE § 16.003(a) (West Supp.2011). Limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Kenneco Energy*, 962 S.W.2d at 514. "[A] plaintiff's cause of action for bad-faith breach of a first-party insurance contract accrues at the time the insurer denied the insured's claim." *Knott*, 128 S.W.3d at 221 (citing *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990)).

### 2. Analysis

In a case involving the denial of disability insurance benefits, the supreme court has addressed the accrual of misrepresentation, breach of the duty of good faith and fair dealing, Texas Insurance Code violations, and DTPA claims. *See Knott*, 128 S.W.3d at 220–21. It held that each of these extra-contractual claims "accrue[d] upon the denial of [the insured's] claim for total disability benefits under the policies." *Id.* It further explained that no "magic words" are required in denying a claim; notice of the insurer's determination of benefits and its reasons are sufficient to trigger accrual of a claim. *Id.*

■■ We hold that Hudspeth's extra-contractual claims accrued upon her receipt of the March 30, 2006 letter from Enterprise stating that, because Enterprise had "not received a continuing dis-

ability claim form in over 50 days," her "file for disability benefits has been closed." This was the first correspondence from Enterprise indicating that her benefits were denied. *See id.* Because she filed suit on March 5, 2008—less than two years after these claims accrued—her extra-contractual claims are not limitations barred. We accordingly sustain Hudspeth's fourth issue.

Because we have concluded that Hudspeth's extra-contractual claims upon which the trial court granted summary judgment were timely, we must address whether Enterprise established its right to summary judgment on the merits of those claims.

## C. DTPA Claims

In her fifth issue, Hudspeth argues the trial court erred by granting summary judgment on her DTPA claims. Hudspeth's petition asserts that Enterprise violated the DTPA by "failing to disclose to Plaintiff that monthly continuing claim forms would be required to maintain Plaintiff's disability insurance at the time of purchase." According to Hudspeth, this "intentional failure to disclose by Defendants was intended to induce Plaintiff into entering into the underlying transaction that forms the basis of this lawsuit." She further avers that "[h]ad Plaintiff known of the underhanded insurance policies of Defendants in dealing with disabled people, Plaintiff would not have entered into the transaction." Finally, the petition contends that Enterprise committed "unconscionable actions 'intentionally' and 'knowingly,'" and that Enterprise violated section 541.051 of the Texas Insurance Code by "misrepresent[ing] the terms of the policy by not providing any terms of the agreement and then imposing excessive and unsubstantiated guidelines not agreed upon by the Parties."

In its motion for summary judgment, Enterprise argued that because "Enterprise clearly disclosed in the Policy that continuation forms would be required to be filled out at regular intervals," Hudspeth's assertion that the Policy was misleading should fail as a matter of law. In her response to Enterprise's motion, Hudspeth argued that the policy was misleading in not disclosing that the policy could be cancelled for not submitting continuation forms and in representing that the policy provided a "one year cure period for failing to submit the monthly continuation forms."

### 1. Applicable Law

■ To prevail on a DTPA claim, the plaintiff must demonstrate (1) the plaintiff's status as a consumer, (2) the defendant can be sued under the DTPA, (3) the defendant committed a wrongful act under the DTPA, and (4) the defendant's actions were a producing cause of the plaintiff's damages. TEX. BUS. & COM.CODE § 17.50(a) (West 2011); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996) ("A consumer must, in order to prevail on a DTPA claim, ... establish that each defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's injury."). To prove a DTPA action for failure to disclose information, the plaintiff must show (1) a failure to disclose, (2) which was known at the time of the transaction, (3) which was intended to induce the plaintiff into a transaction, and (4) that the plaintiff otherwise would not have entered the transaction if the information had been disclosed. *Colonial Cnty. Mut. Ins. Co. v. Valdez*, 30 S.W.3d 514, 517–18 (Tex.App.-Corpus Christi 2000, no pet.).

### 2. Analysis

Enterprise can show its entitlement to summary judgment on Hudspeth's DTPA claim by demonstrating that its policy "did not make any misrepresentations," *Sonic Sys. Int'l, Inc. v. Croix*, 278 S.W.3d 377, 396 (Tex.App.-Houston [14th Dist.] 2008, pet. denied), and that the policy language did not create a misleading impression about the scope of coverage, *Howard v. Burlington Ins. Co.*, 347 S.W.3d 783, 793 (Tex.App.-Dallas 2011, no pet.) (affirming summary judgment on plaintiff's DTPA claim that liability fire insurance policy was misleading by not specifically stating that it did not cover insured's personal property, because nothing in the policy language "would lead a reasonable person to a false conclusion about" the coverage provided by the policy).

Hudspeth's DTPA claims all relate to the policy language regarding submission of claim forms. Hudspeth points to the language in the "RULES FOR FILING A DISABILITY CLAIM SECTION":

> Any subsequent written proof of the continuation of the disability must be furnished to the insurer at such intervals as the insurer may reasonably require. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

Hudspeth claims that the term "regular intervals is not defined anywhere within the policy." Thus, according to her, Enterprise knew "the definition of 'reasonable' prior to Mrs. Hudspeth's signing the policy contract was the 15th of each month, and that failure to submit the continuing claim forms would result in cancellation of the disability insurance and denial of benefits regardless of what was reasonable for the claim."

Hudspeth's argument ignores that the section of the policy defining "total disability" states that the "insured will be required to give the Company written proof of the continuing Total Disability at monthly intervals in order to justify the continuing payment of benefits." Given this, the trial court correctly determined that, as a matter of law, Enterprise did not make a misrepresentation in its policy regarding the requirement that monthly claim forms be submitted. As for Hudspeth's claims that it was unreasonable for Enterprise to allow her less than one year to submit the claim forms in light of the one-year language in the policy, that evidence may have been relevant to the jury's determination that Enterprise breached the policy terms, but that argument does not support her DTPA claim that Enterprise made misrepresentations in the insurance contract. The trial court correctly granted summary judgment on Hudspeth's DTPA claims.

We overrule Hudspeth's fifth issue.

### D. Good Faith and Fair Dealing Claim

In her sixth issue, Hudspeth argues that the trial court erred by granting summary judgment on her breach of the duty of good faith and fair dealing claim. Hudspeth's petition asserts that Enterprise breached a duty of good faith and fair dealing because it "had no reasonable basis for denial of Plaintiff's claim or to delay payment."

In its motion for summary judgment, Enterprise argued that, contrary to Hudspeth's assertion, it did not deny her claim. Rather, it approved her claim for disability and paid initial benefits on the policy. According to Enterprise, Hudspeth is the one who failed to comply with the terms of the policy requiring a continuing claim form to be filed such that Enterprise was unable to assess whether she had a continuing dis-

ability. In her response to Enterprise's motion, Hudspeth argued that the policy was misleading in not disclosing that the policy could be cancelled for not submitting continuation forms and in representing that the policy provided a "one year cure period for failing to submit the monthly continuation forms."

### 1. Applicable Law

Texas law recognizes a duty of good faith and fair dealing in the insurance context. *Arnold v. Nat'l Cnty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). The duty arises from the special relationship that is created by the contract between the insurer and the insured. *Id.*; *see also Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex.1990) (recognizing that the duty arises "not from the terms of the insurance contract, but from an obligation imposed in law" as a result of the special relationship). A claim for breach of the duty of good faith and fair dealing is separate from any claim for breach of the underlying insurance contract, *Viles*, 788 S.W.2d at 567, and the threshold of bad faith is reached only when the breach of contract is accompanied by an independent tort. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex.1994). To prevail, the insured must prove that the insurer had no reasonable basis for denial or delay in payment of a claim and that the insurer knew or should have known of that fact. *Id.* at 18; *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988). An insurer does not breach its duty merely by erroneously denying a claim. *Moriel*, 879 S.W.2d at 17. An insurer may demonstrate its entitlement to summary judgment on this type of claim by demonstrating that there is "a good faith dispute as to coverage." *United States Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex.1997); *see also Perrotta v. Farmers Ins. Exch.*, 47 S.W.3d

569, 575 (Tex. App.-Houston [1st Dist.] 2001, no pet.) (affirming summary judgment on insured's good faith and fair dealing claim because the evidence demonstrated that the insurer "had a reasonable basis for denying the claim based on [the insured's] own breach of the policy").

██ The insured can also establish that an insurer breached the duty of good faith and fair dealing by demonstrating that the insured "wrongfully cancel[ed] an insurance policy without a reasonable basis[ ]" and "the insurer knew or should have known of that fact." *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 283 (Tex.1994); *see also Rice v. Metro. Life Ins. Co.,* 324 S.W.3d 660, 672 (Tex.App.-Fort Worth 2010, no pet.) (reversing summary judgment on breach of good faith and fair dealing claim because "there is more than a scintilla of evidence that MetLife wrongfully canceled Larry's new coverage without a reasonable basis and knew or should have known of that fact").

## 2. Analysis

Hudspeth acknowledges that Enterprise initially approved her claim in December 2005, and that Enterprise's closing her file in March 2006 was based on her failure to submit continuing claim forms. She argues, however, that Enterprise's failure to reconsider the status of her file upon her filing a continuing claim form in April 2006 amounted to a breach of Enterprise's duty of good faith and fair dealing. Enterprise responds that its denial of Hudspeth's claim was warranted by her failure to submit continuing claim forms. Enterprise's brief does not directly address Hudspeth's argument that Enterprise's failure to reconsider her claim when presented with additional documentation amounted to a breach of the duty of good faith and fair dealing.

██ The supreme court has held that, while an insured's failure to timely submit documentation will not always defeat a claim that an insurer breached its duty of good faith and fair dealing, in certain cases "failure to comply with the policy's requirement as to proof of loss may constitute a reasonable basis for denial of the claim." *Viles,* 788 S.W.2d at 567. "Whether there is a reasonable basis for denial, however, must be judged by the facts before the insurer at the time the claim was denied." *Id.* Here, it is undisputed that—when Enterprise formally denied Hudspeth's claim and closed her file on March 30, 2006—she had not submitted any continuing disability claim forms as required by the policy. Accordingly, Enterprise was entitled to summary judgment on any breach of good faith and fair dealing claim based upon the March denial of her claim.

██ The same is not true, however, of Enterprise's June denial of Hudspeth's request for reconsideration of the denial of her claim. The policy provided that proof of continuing disability must be furnished "as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required." In March 2006, when Enterprise sent Hudspeth notice that it was denying her claim because she had not documented her continuing disability for more than 50 days, it invited her to submit any documentation that "would cause us to reconsider our position." Hudspeth did so in April as soon as she was able to get that documentation. When Enterprise denied her claim in June 2006, it stated that it had reviewed that documentation, but that her policy had been "cancelled prior to the date of the loss." Given that none of the policy conditions for termination or cancellation of coverage had occurred at that point, and

given that Hudspeth had provided documentation in compliance with the policy terms, Enterprise did not establish as a matter of law that the June denial was the result of "a good faith dispute as to coverage." *Williams*, 955 S.W.2d at 268. Accordingly, the trial court erred by granting summary judgment on Hudspeth's breach of good faith and fair dealing claim as it relates to the June 2006 denial.

We sustain Hudspeth's sixth issue.

## E. Negligence Claim

In her seventh issue, Hudspeth argues that the trial court erred by granting summary judgment on her negligence claim. Hudspeth's petition asserts Enterprise acted outside the standard of care set by the Texas Insurance Code, and that it "had a duty to explain the unstated terms of the contract which they were attempting to enforce." "As a direct and proximate cause of that breach," Hudspeth asserts, she "relied upon and purchased disability insurance coverage to [her] detriment, only to have her vehicle repossessed."

In its motion for summary judgment, Enterprise argued that under Texas law it had no duty to explain its policy to Hudspeth. While Hudspeth alleges that she was not told she would be required to submit monthly continuing claim forms if she became disabled, Enterprise argues that requirement was clearly set forth in the policy. According to Enterprise, Hudspeth had a duty to read the policy, is charged with knowledge of its conditions and coverage, and is bound by its terms. Because there were no "unstated" terms of the policy, and because Enterprise had no duty under Texas law to explain the policy to Hudspeth, Enterprise argued that Hudspeth's negligence claim should fail as a matter of law. In response, Hudspeth argued that the Insurance Code imposes upon Enterprise a duty not to misrepresent their insurance policy "by making an untrue statement of material fact, by failing to state the unstated terms of the insurance policy which rendered the stated terms false and misleading or by making a statement of their insurance policy that would mislead a prudent person to a false conclusion of material fact." According to Hudspeth, the policy represented to her that she would have up to one year to cure any failure to file a monthly form, and it failed to inform her that failure to submit forms for 50 days would result in cancellation of coverage and denial of accrued benefits.

### 1. Applicable Law

 A negligence cause of action has three elements: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 310 (Tex.App.-Houston [1st Dist.] 2007, no pet.). The threshold inquiry in a negligence case is duty. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). Generally, the existence of duty is a question of law for the court. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex.1998); *Siegler*, 899 S.W.2d at 197; *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

 An insurer does not have a duty to explain to an insured terms and coverage included in an application for insurance. *N. Am. Shipbuilding, Inc. v. S. Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 836 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Riggs v. Sentry Ins.*, 821 S.W.2d 701, 705 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

### 2. Analysis

 Hudspeth essentially complains that Enterprise did not adequately explain

the policy terms to her. She also points to the language that "[f]ailure to furnish such proof [of continuing disability] within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonable possible and in no event ... later than one year from the time proof is otherwise required." She asserts an explanation was necessary because the term " 'reasonably' is misleading under the language of the policy."

Enterprise correctly notes that, under Texas law, an insurer does not have a duty to explain terms or coverage included in an insurance application or contract. *N. Am. Shipbuilding, Inc.*, 930 S.W.2d at 836. Hudspeth's complaint about Enterprise's application of the term "reasonable" as it relates to how long it gave her to submit continuing claim forms may go to whether Enterprise breached the insurance contract, but it does not create a duty in Enterprise to have given Hudspeth additional explanations about the policy terms when the insurance contract was executed. Because Enterprise did not owe Hudspeth this sort of duty to explain the terms of the policy, the trial court did not err in granting summary judgment on her negligence claim.

We overrule Hudspeth's seventh issue.

## CONCLUSION

Having sustained Hudspeth's second and third issues, we reverse and remand the trial court's judgment for recalculation of the damages awarded consistent with opinion. Having sustained Hudspeth's fourth and sixth issues, we reverse the trial court's summary judgment on Hudspeth's breach of good faith and fair dealing claim and remand that claim to the

trial court. In all other respects, we affirm the trial court's judgment.