## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 12, 2019

Lyle W. Cayce
Clerk

No. 17-20709

BAKER HUGHES PROCESS AND PIPELINE SERVICES, L.L.C.,

Plaintiff - Appellant

v.

UE COMPRESSION, L.L.C.,

Defendant – Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, HO, and OLDHAM, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Baker Hughes sued UE Compression for breach of contract and express and implied warranties after a containerized air booster compressor manufactured by UE ruptured on the job in Western Australia, injuring a Baker Hughes contractor (the "Incident"). The district court rejected all of Baker Hughes's claims on summary judgment and awarded sanctions to UE for Baker Hughes's misplacement and destruction of the allegedly defective compressor part. Finding no reversible error of law or fact in the court's ruling on these and related issues, we **AFFIRM**.

No. 17-20709

## BACKGROUND

BJ Process and Pipeline Services (Australia) Pty. Ltd., Baker Hughes's predecessor, entered into an agreement in December 2011 for UE to configure and supply seven containerized air booster compressors for use by Chevron on its Gorgon project in Western Australia. Baker Hughes used these units in putting Chevron's pipeline into service, including dewatering and hydrotesting functions. In November 2014, Baker Hughes's contractors were using the boosters when the drain line on one of the boosters exploded and injured a Baker Hughes contractor. All seven of the boosters were taken offline while the Incident was investigated, and Baker Hughes was forced to rent replacement boosters to fulfill its contract with Chevron. The explosion and its aftermath cost Baker Hughes millions of dollars.

Baker Hughes filed this suit for breach of express warranty, breach of implied warranties of merchantability and fitness, and breach of contract. The company alleged that UE improperly selected a ball valve for the drain line of the boosters and provided deficient drain line configuration.

The plaintiff's case turns on the parties' contract. The entire contract consists of four documents: (1) the agreement for the supply of the boosters (the "Supply Agreement"); (2) the LOGIC General Conditions of Contract (the "LOGIC Terms")[1]; (3) Baker Hughes's Purchase Specification for Containerized Air Booster Compressor System (the "Specification"); and (4) UE's Quote. The LOGIC Terms of the agreement control unless modified by the Supply

---

[1] The LOGIC Terms constitute a standard contract for the UK Offshore Oil and Gas Industry, in this case comprising General Conditions of Contract (including Guidance Notes) for Supply of Major Items of Plant and Equipment.

2

Agreement.    A choice of law provision mandates that Texas law governs controversies arising from the contract.

The Supply Agreement states that UE shall provide seven "6425 Nm3/hr 150 Barg booster compressor units," which "shall be supplied in full compliance with the [Specification] and [the Quote]."    UE's Quote represents that the boosters will be designed to meet the performance specifications provided by Baker Hughes.    The LOGIC Terms reinforce the allocation of design responsibility to Baker Hughes.    Section 4.3 of the LOGIC Terms provides that, "[e]xcept as expressly specified in the Contract [UE] shall not be responsible for the design of any part of the Permanent Work."    Further, Section 12.1 of the LOGIC Terms requires Baker Hughes to furnish "technical information," including documents and drawings, as necessary to carry out the manufacture.    Baker Hughes retained the right under Section 14.1(a) of the LOGIC Terms to modify the specifications at any time as the boosters were being built.    For any sketches, drawings, calculations, reports or recommendations relating to the product that UE might be required to produce, Baker Hughes required UE to submit those for prior review and approval, affording Baker Hughes sufficient time to conduct its review.

The express warranty pertinent to the claims at issue is contained in § 28 of the LOGIC Terms:

> 28.1: [UE] warrants and guarantees that it has performed and shall perform the WORK in accordance with the provisions of the CONTRACT, and that the PERMANENT WORK will be free from defects.

> 28.2: In the event that [Baker Hughes] notifies the CONTRACTOR [UE] of any defects in the WORK prior to or subsequent to the COMPLETION DATE in accordance with Clause 27 hereof and

## No. 17-20709

> within the relevant Defects Correction Period or Periods specified in Appendix 1 to Section I – Form of Agreement, [UE] shall, subject to the operational requirements of [Baker Hughes] and to the provisions of Clause 28.3, carry out all works necessary to correct any defects in the WORK arising from any default of the CONTRACTOR GROUP.

The relevant appendix sets the defects correction period as "1.5 years after shipment or 1 year from the date of the first field use of the unit, whichever occurs first." The WORK described in this express warranty is defined by the LOGIC Terms to mean "all work that [UE] is required to carry out in accordance with the provisions of the CONTRACT, including the provision of all materials, service and equipment to be rendered in accordance with the CONTRACT."

In its complaint, Baker Hughes identified three express warranties that UE allegedly breached: (1) UE would "perform its obligations under the Agreement with all due care and diligence and with the skill to be expected of a reputable, experienced contractor"; (2) the boosters would be "fit for the purposes specified in the Agreement"; and (3) the boosters would be "free from defects." Baker Hughes pled breach of contract based on UE's failures "to meet its obligations by, among other things, providing an air booster that stopped functioning" and "to provide a timely replacement air booster compressor and to repair and/or replace the other compressor units on site." Baker Hughes sought damages including the full sales price of the boosters (more than $6.8 million), approximately $11 million for losses it allegedly incurred under its contract with Chevron, and approximately $1.4 million for replacement booster rental fees.

No. 17-20709

The district court granted UE's motion for summary judgment and dismissed Baker Hughes's claims.  The district court found that: (1) Section 28.2 of the Agreement was Baker Hughes's sole remedy for breach of express warranty; (2) the implied warranty of merchantability is inconsistent with Section 28.2 and is thus displaced; (3) no implied warranty of fitness for a particular purpose arose because Baker Hughes provided specifications for the boosters and the Agreement provided that UE would "not be responsible for the design" of the boosters; and (4) Baker Hughes's breach of contract claim, relating only to the general defectiveness of the boosters, was superseded by its express warranty claim.[2]

UE sought sanctions for its costs resulting from Baker Hughes's failure to make the subject ball valve available for inspection by UE's expert in Australia as the parties had agreed and for destroying the ball valve before UE's expert could inspect it.   After an oral hearing, the district court granted UE's motion, assessing monetary sanctions and a mandatory adverse-inference instruction because of Baker Hughes's destruction of the ball valve.

Baker Hughes moved for a new trial and to reopen the summary judgment record.   In response, the district court agreed that it had erred in finding as a matter of law that there was no reliance by Baker Hughes that would give rise to the implied warranty of fitness for a particular purpose, but the court ultimately denied Baker Hughes's motion because the parties' agreement placed the sole responsibility for the design on Baker Hughes. Baker Hughes appeals from all adverse rulings and the judgment.

---

[2] The court accordingly denied as moot Baker Hughes's and UE's motions for partial summary judgment.

No. 17-20709

## STANDARD OF REVIEW

Summary judgment should be rendered only if the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). This court reviews the district court's grant of summary judgment *de novo*. *Haley v. Townley*, 45 F.3d 914, 917 (5th Cir. 1995).

The district court's order denying Baker Hughes's motion for new trial and to reopen the summary judgment record is reviewed for abuse of discretion. *See Templet v. HydroChem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004). The district court's award of sanctions is also reviewed for abuse of discretion. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). A district court abuses its discretion by assessing sanctions if its ruling is based on an "erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## DISCUSSION

Breach of contract, breach of express warranty, and breach of implied warranties for fitness and merchantability are all the subjects of Baker Hughes's complaint and its quest to reverse the adverse judgment. We discuss each theory in turn. Texas law governs this diversity case according to the parties' choice of law provision.

### 1. Breach of contract

Although this is not Baker Hughes's principal point in briefing, as a matter of logic the first question we should consider is whether Baker Hughes's complaints about the booster may be examined as both a breach of contract and breach of warranties. Like the district court, we conclude that Baker

No. 17-20709

Hughes's case sounds exclusively in warranty.[3]     Breach of contract and warranty claims are distinct causes of action under Texas law and provide for different remedies, and Texas law forbids conflating breach of warranty and breach of contract.     *Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 897 (Tex. App.—Houston [1st Dist.] 2002); *Med. City Dall., Ltd. v. Carlisle Corp.,* 251 S.W.3d 55, 60 (Tex. 2008).     A breach of contract claim exists when "a party fails to deliver the goods as promised."     *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 812 (S.D. Tex. 2013).     Damages "are only permitted under a breach of contract cause of action when the seller has failed to deliver the goods, the buyer has rejected the goods, or the buyer has revoked his acceptance."     *Luig v. N. Bay Enterprises, Inc.*, 817 F.3d 901, 906 (5th Cir. 2016) (citing *A.O. Smith Corp. v. Elbi S.p.A.*, 123 F. App'x 617, 619 (5th Cir. Feb. 22, 2005)).     Texas law allows a buyer to revoke acceptance of a good "if the good was accepted without knowledge of the nonconformity and 'acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurance.'"     *Id.* (citing *Toshiba Mach. Co., Am. V. SPM Flow Control, Inc.*, 180 S.W.3d 761, 772 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.)).     If a buyer retains and uses, alters, or changes the goods, it will be found to have accepted them.     *Bacchus Indus. v. Frontier Mech. Contractors*, 36 S.W.3d 579, 584 (Tex. App.—El Paso 2000, no pet.); *see also* Tex. Bus. & Com. Code § 2.606 (describing actions constituting the

---

[3] Aside from ruling that claims for contract breach and warranty do not overlap in Texas law, the district court faulted Baker Hughes for failing to plead specific contract sections that it contended were breached.     Texas law does not require such specificity. *Bowen v. Robinson,* 227 S.W.3d 86, 94 (Tex. App.—Houston [1st Dist.] 2006).     Whether that matters in a federal diversity case, we need not decide.     Baker Hughes's attempts to put flesh on the barebones contract breach pleading in this court fall short either way.

No. 17-20709

acceptance of goods, including when the buyer "take[s] or retain[s]" the goods "in spite of their non-conformity" or "does any act inconsistent with the seller's ownership" of the goods).    Baker Hughes does not attempt to show that UE failed to deliver the boosters, that Baker Hughes rejected them, or that it revoked its acceptance.    Baker Hughes accepted the boosters, and paid for and took possession of the boosters after conducting inspections and factory acceptance tests.[4]

The gravamen of Baker Hughes's complaint instead is that UE improperly designed the boosters by incorporating a ball valve into the drain system.    As the district court observed, this is best understood as a breach of warranty claim, which arises when a seller "delivers nonconforming goods." *Omni USA*, 964 F. Supp. 2d at 812; *see generally Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991) ("The UCC recognizes that breach of contract and breach of warranty are not the same cause of action.    The remedies for breach of contract are set forth in [Texas Business and Commerce Code] section 2.711, and are available to a buyer 'where the seller fails to make delivery. . . .' The remedies for breach of warranty, however, are set forth in section 2.714, and are available to a buyer who has finally accepted goods, but discovers the goods are defective in some manner.    Tex. Bus. & Com. Code § 2.714, § 2.711 (Comment 1).").    Thus, "the critical factor in whether the buyer has a breach

---

[4] This claim also cannot be pursued as a "non-conformity" claim under contract law, for such a claim can only arise from a breach of contract where the alleged non-conformity relates to the "specific obligations of the seller under the terms of the contractual agreement." *Contractor's Source Inc. v. Hanes Cos., Inc.*, No. 09-CV-0069, 2009 WL 6443116, 2009 U.S. Dist. LEXIS 126518, *23 (S.D. Tex. Dec. 29, 2009).    But Baker Hughes can point to no contractual provision establishing UE's specific obligation to use a valve other than a ball valve.

No. 17-20709

of contract or breach of warranty claim is whether the buyer has finally accepted the goods." *Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 310 (Tex. App.—Dallas 2006, no pet.) (citing Tex. Bus. & Com. Code §§ 2.711, 2.714); *see also Trident Steel Corp. v. Wiser Oil Co.*, 223 S.W.3d 520, 526 (Tex. App.—Amarillo 2006, pet. denied) ("[I]t is the buyer's acceptance or rejection of goods which determines the remedies available to the buyer, not the seller's mere delivery of something.").

Citing this court's opinion in *Reynolds Metals Co. v. Westinghouse Elec. Corp.,* 758 F.2d 1073 (5th Cir. 1985), Baker Hughes contends that UE's contractual obligations were somehow breached and are actionable in addition to a warranty claim based on the defective condition of the booster valve or drainage configuration.    In *Reynolds Metals,* the supplier of an electric transformer supervised its installation with an allegedly incompetent engineer whose failure to correctly ground the device contributed to the transformer's burning up.    *Id.* at 1075.    Thus, a breach of performance occurred separate from the warranty breach.    No such actions apart from the construction of the boosters are alleged here.    Baker Hughes alludes to certain codes and standards that were allegedly not complied with in the construction of these boosters, but it accepted the goods, eliminating pre-delivery claims other than for warranty.    To top it off, the express warranty here covers the WORK, a defined term that expressly includes "services" to be performed by UE; clearly, "services" must include any design work UE performed under the contract.

Under Texas law, this is a claim for breach of warranty, not breach of contract.

## 2. Express warranty

Section 28 of the LOGIC Terms, titled "Defects Correction," provides that UE "warrants and guarantees" that it will perform the subject WORK in accord with the contractual provisions and that the boosters will be free from defects. Section 28.2 specifies the period within which defects must be pointed out to UE and incorporates, at most, an 18-month period from the date of shipment for such notification.   As the district court noted, this provision embodies the contract's only warranty language, explicitly uses the term "warrants," and sets out procedures necessary for Baker Hughes to have defects corrected.[5] Baker Hughes identifies no other provision of the Agreement that constitutes an express warranty.   Baker Hughes admits it failed to notify UE that the ball valve was an unsatisfactory component of the drain line before the 18-month deadline expired.   On its face, the warranty period expired and offers Baker Hughes no remedy.

Baker Hughes contends, however, that the Texas Business and Commerce Code requires the exclusivity of a contractual remedy to be expressly stated, otherwise any other remedy is considered optional and cumulative.   Tex. Bus. & Com. Code § 2.719(a)(2).   Baker Hughes is correct, but it misstates the holding of the district court.   The district court explained in its order denying a motion for reconsideration that it did not find Section 28 to be the only remedy for *any dispute* in the agreement.   Rather, Section 28 is the express warranty for *defects* in the WORK.   Because Baker Hughes was suing for UE's failure to properly design the boosters, which resulted in a

---

[5] UE asserts that the warranty here was limited under several clauses of Section 28.4 concerning matters like proper operation and specified operating conditions, but we do not reach those arguments.

No. 17-20709

defective product, Section 28 provided the exclusive warranty for defects. Baker Hughes's complaint avers that UE provided an air booster that "stopped functioning."   Section 28 is not the only remedy in the Agreement, but it is the only remedy for fixing defects in the product that "stopped functioning." And to reiterate, the WORK warranted under Section 28.1 includes "services," which by its nature includes design "services" furnished by UE.

Second, to overcome the 18-month warranty expiration date with a general 4-year limitation period referenced elsewhere in the contract, Baker Hughes argues that the LOGIC Terms include other express warranties, such as Sections 4.1, 4.2, and 9.2.   But those terms merely outline UE's general obligations under the contract.   For example, Baker Hughes claims that pursuant to Section 4.2, if UE designed any part of the boosters, it must do so "with all due care and diligence," in such a way that the boosters would be "fit for the purposes specified in the CONTRACT."   This provision applies to design services, however, only if UE had express responsibility for design in accord with Section 4.3; Baker Hughes has not offered evidence confirming UE's design responsibility for the drain system on the boosters.   In any event, this provision makes no express affirmation or promise that the boosters would be free from defects.   Likewise, Section 9.2, which requires that personnel employed by UE be "competent, properly qualified, skilled, and experienced in accordance with good industry practice," and Section 4.1, which requires UE to provide adequate personnel, equipment, and facilities to manufacture the boosters, state generalities different from any express affirmation of the quality of the end products.   Important as these provisions are, they do not

call into question that Section 28 provided Baker Hughes with its sole remedy for defective WORK.

The boosters were shipped in March 2013, triggering commencement of the warranty period, and 20 months later, the Incident occurred in late November 2014. Baker Hughes did not notify UE timely under Section 28 to trigger the warranty. Consequently, the express warranty for defects correction expired, taking with it Baker Hughes's remedy for the defective booster.

### 3. Implied warranties

Baker Hughes also contends that UE breached the implied warranties of merchantability and fitness for a particular use. Tex. Bus. & Comm. Code §§ 2.314, 2.315. Baker Hughes adds that these warranties should apply to the Agreement because, under Texas law, implied warranties may not be disclaimed unless the intention to do so is clearly and conspicuously expressed. *See* Tex. Bus. & Comm. Code § 2.316. Further, the implied warranties would be actionable within a statutory four-year statute of limitations rather than the 18-month period of the Section 28 express warranty. UE responds, and the district court agreed, that the implied warranties were displaced by Section 28's express warranty and by Section 4.3's complete allocation of responsibility for the boosters' design to Baker Hughes.[6] We agree with UE.

Texas Bus. & Com. Code § 2.316 permits the exclusion or modification of warranties in connection with a sale of goods, subject to qualifications: a written disclaimer or modification of implied warranties must be conspicuous,

---

[6] To re-emphasize, Section 4.3 states: "Except as expressly specified in the Contract [UE] shall not be responsible for the design of any part of the PERMANENT WORK."

No. 17-20709

and, if applicable, must mention "merchantability" explicitly.   Tex. Bus. & Comm. Code § 2.316(b).[7]   No language in the parties' Agreement purports to exclude or modify either implied warranty, and nowhere is the implied warranty of merchantability mentioned.   However, Comment 9 describes an exception to these requirements where the parties' agreement does not require protection of the buyer, and implied warranties may nevertheless be excluded by other contractual terms:

> The situation in which the buyer gives precise and complete specifications to the seller is not explicitly covered in this section, but this is a frequent circumstance by which the implied warranties may be excluded.   The warranty of fitness for a particular purpose would not normally arise since in such a situation there is usually no reliance on the seller by the buyer. The warranty of merchantability in such a transaction, however, must be considered in connection with the next section on the cumulation and conflict of warranties.   Under paragraph (c) of that section in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications.   Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications.

Tex. Bus & Com. Code § 2.316 (Comment 9).   It appears that Texas courts have not considered how to apply Comment 9, but the Third Circuit addressed precisely this question when it interpreted New Jersey's identical Uniform

---

[7] Subsection (c) indicates that this rule does not apply where certain explicit expressions, examination of the goods by the buyer or refusal to so examine, or the course of dealing, course of performance, or usage of trade, displace the implied warranties.   Because Comment 9 directly contemplates the facts of this case, this court need not reach whether Subsection (c) independently excludes the implied warranties here.

No. 17-20709

Commercial Code provision and Comment 9.    *See New Jersey Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 328–30 (3rd Cir. 2007).

In *New Jersey Transit,* the court found no implied warranties according to Comment 9 where the Transit Company included dozens of pages of specifications in its purchase agreement for a track geometry inspection vehicle.    *Id.* at 324-25.    As the Third Circuit recognized, Comment 9 envisions the scenario involved here–where Baker Hughes, a sophisticated purchaser, has provided detailed specifications for UE to implement.    This is the type of situation where the implied warranties are excluded.    The implied warranty of fitness for a particular purpose does not arise because this Agreement included 18 single-space pages of Baker Hughes's Specification and a 21-page responsive set of specifications comprising UE's Quote.    Baker Hughes ordered exactly what it required in the boosters.    Other contractual provisions cited above confirm Baker Hughes's ultimate responsibility for the design, its duty to supply technical information, its ability to modify specs during the fabrication, and its right to approve any drawings or specifications prepared by UE.[8]

---

[8] Baker Hughes does not address *New Jersey Transit*.    Instead, Baker Hughes simply points out that the district court, although initially influenced by Comment 9, later determined that fact questions exist as to whether the specifications Baker Hughes provided were precise and complete and whether there was no reliance by Baker Hughes on UE's discretion.    Initially, we note that *New Jersey Transit* resolved the exclusion of an implied warranty of fitness under Comment 9 on review of a summary judgment.    In any event, Baker Hughes fails to account for the Agreement's disclaimer of any responsibility on the part of UE for the Boosters' design and the requirement for Baker Hughes to provide or agree to specifications with which UE was required to comply.    Regardless of whether Baker Hughes's specifications were complete to the last nut and bolt, Baker Hughes assumed final responsibility for the design.    *See School Supply Serv. Co. v. J.H. Henney & Co.,* 410 F.2d 481, 483 (5th Cir. 1969) (citing Comment 9 and finding that "in order for there to be an

No. 17-20709

Under Comment 9, the analysis due the implied warranty of merchantability, however, requires a further step:   it "must be considered in connection with the next section on the cumulation and conflict of warranties [2.317]," and "under paragraph (c) of that section" the implied warranty of merchantability is displaced if there is an inconsistency between the implied warranty and the express warranty that the goods will comply with the specifications.   Tex. Bus. & Com. Code § 2.316 (Comment 9).   Section 2.317, in turn, provides that:

> Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant.   In ascertaining that intention the following rules apply: . . . (3) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose.

*Id.* § 2.317.   The relevant analysis for exclusion of the implied warranty of merchantability considers whether the implied warranty and the contractual express warranty are consistent, and this court must construe the warranties as consistent and cumulative, unless such a construction is unreasonable.

Baker Hughes asserts that the warranties are cumulative, because the implied warranty of merchantability applies to the condition of goods at the time of delivery, while the express warranty in Section 28 guarantees that the boosters would be free of defects for a period of time past delivery.[9]   Baker

---

implied warranty of the sufficiency of the design, the *seller must be responsible for the design*") (emphasis added).

[9] Baker Hughes additionally argues that whether a good is merchantable is a different question from whether a good has defects, since a good can be unmerchantable even though undefective.   But this court need not address whether merchantability is distinct

No. 17-20709

Hughes relies on *Dickerson v. Mountain View Equip. Co.*, 710 P.2d 621 (Idaho Ct. App. 1985) and *S-C Industries v. American Hydroponics System, Inc.*, 468 F.2d 852 (5th Cir. 1972) (per curiam).   Both cases are distinguishable. In *Dickerson*, an express warranty that covered a used tractor's defects arising post-sale was held not to supersede an implied warranty of merchantability. 710 P.2d at 625–26.   In *S-C Industries*, an express warranty based on a discrete metric, the strength of a structure, was held not to supersede the implied warranty of merchantability.   468 F.2d at 855.   Section 28 differs from the express warranties in those cases; it covers defects in the work at the time of delivery, and additionally indicates that if there is a defect, UE will "carry out all works necessary to correct any defects in the WORK arising from any default of the CONTRACTOR GROUP [UE]."   Since UE's involvement in the design of the boosters terminated at delivery, the only defects that could "arise from any default" of UE are those contained in the boosters at the time of delivery.

Because the express and implied warranties cover the same performance—that the boosters would be free of defects at the time of delivery—but are inconsistent as to time limitations, the implied warranty is displaced as envisioned by Comment 9.[10]   *See N.J. Transit*, 497 F.3d at 329 (where express warranty and implied warranty of merchantability differed

---

from whether a good lacks defects because Baker Hughes asserts no other ground of unmerchantability other than a defect in the boosters.

[10] Baker Hughes argues that because the remedy period applies up to 18 months after shipment or 1 year from the field test, this was a warranty by UE that the boosters would be free of defects past the time of delivery.   But this misreads Section 28, which still applies only to defects attributable to UE, whose involvement terminated at delivery.

No. 17-20709

only as to the period of time applicable to each, it would be "unreasonable" to conclude that the longer implied warranty was controlling).

**4. Sanctions**

Baker Hughes challenges the monetary sanction awarded against it.[11] The district court sanctioned Baker Hughes for fees and costs involved when UE sent an expert to Australia to inspect the ball valve that allegedly malfunctioned in the booster.   Baker Hughes refused to ship it to Houston and instead, experts for both parties planned to inspect the ball valve in Australia at Baker Hughes's facility.   Once there, neither expert could inspect the ball valve because Baker Hughes did not produce it.   Eventually, Baker Hughes shipped the valve to Utah, although in a further damaged state because of storage conditions.   The district court found that the trip to Australia was "frustrated" but not "completely wasted" and so awarded partial expenses and attorneys' fees.

Baker Hughes does not argue that the court's decision was based on a "clearly erroneous assessment of the evidence."   Instead, the company contends that the sanctions constituted an abuse of discretion because Baker Hughes eventually shipped the valve to UE's expert in the United States.   But given that Baker Hughes's delay still wasted a portion of the UE expert's Australia trip, there was no abuse of discretion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

[11] This court need not reach the related spoliation issue, and Baker Hughes's cross-motion for summary judgment on consequential damages is mooted by this opinion.